**MEMORANDUM IN SUPPORT OF PLAINTIFF'S**
**OPPOSITION OF DEFENDANTS' MOTION TO DISMISS**

**A. The Parties.**

**Plaintiff, Kipp Gibbs:** The Plaintiff has a business degree with a major in business law, and credits exceeding College of Arts & Sciences requirements for minors in Physics, Finance and Mathematics.[1] After graduation, Mr. Gibbs worked in Boston as a licensed stockbroker. Currently, Mr. Gibbs works in the mortgage industry on a daily basis, and is verse in interest calculations.[2]

**Sallie Mae Servicing, L.P.:** According to SLM Corporation's organizational chart, from its fact sheet (attached hereto as "Exhibit 1"), Sallie Mae Servicing, L.P. is an 100% owned corporate entity of SLM Corporation. As of December 2003, it was indirectly owned through Sallie Mae, Inc.

**Nellie Mae:** According to Sallie Mae's year 2000 annual 10-K (attached as "Exhibit 2"), Sallie Mae acquired "Nellie Mae in 1999." Nellie Mae is listed in the corporate organizational chart of SLM Corporation (Exhibit 1) as "Nellie Mae Corp.," which is 100% owned by SLM Corp.[3]

**USA Funds:** Defendants state that USA Funds is an "independent" company. This is an ambiguous use of the term *independent*. "We provide a full complement of administrative services to...USA Funds.... [Sallie Mae] performs services including loan origination, account maintenance, default aversion and collections...," according to pp. 6 and F-13 of Sallie Mae's 2002 10-K filed with the SEC (please see "Exhibit 3" Items B and C.)

However, USA Funds does not function as an ordinary, arms-length, third-party company. On July 31, 2000, SLM Holding Corp. purchased USA Group, Inc., which owned USA Funds, and as part of the deal, USA Group left USA Funds out of the acquisition, but pledged it's income and operations to SLM Holding Corp., which SLM Corp. still controls today in an automatically renewing, perpetual contract. Indeed, SLM Corp. owns the service mark *USA Funds,* which was sold to SLM Holding Corp. as part of the deal. This unique, intricate arrangement would appear from SLM Corp.'s SEC filings to be merely a tax advantage, since USA Funds has nonprofit status. As of December 2003, through its wholly-owned subsidiary, Sallie Mae Servicing, L.P., SLM Corp. controlled absolutely USA Funds. To date, there has not been an SEC filing stating that Sallie Mae Servicing, L.P. has been sold. It has, however, according to the Defendants, been renamed on December 31, 2003.

USA Funds is the only nonprofit organization functioning within the multitude of companies that comprise the multi-billion dollar corporate empire of SLM Corporation.

---

[1] Minors are awarded in the College of Arts and Sciences, but not in the business school.
[2] Plaintiff retained counsel, however, Mr. Gibbs found that the attorney he retained did not have sufficient time to get his mind around the complexities of this case. Therefore, Mr. Gibbs decided to continue pro se until the resolution of dispositive motion.
[3] Nellie Mae, as stated in the complaint, has its principal place of business at 50 Braintree Hill Park, Suite 300, Braintree, MA 02184; and used to be a Massachusetts corporation, but has since, according to the Defendants, been re-incorporated in Delaware. A summons for "Nellie Mae Corporation" was given to the U.S. Marshal's office located in the United States District Court for the District of Massachusetts on December 10, 2003 (attached as "Exhibit 14"), but was not served because it was not officially a federal case. On or about January 2, 2004, in person, the new, federal case number was entered on the form, and the holiday staffed U.S. Marshals office accepted it for service, but subsequently mailed it to the Plaintiff, with a letter (attached as "Exhibit 15") saying it wasn't a federal case, though by then it was. The Plaintiff mailed it back with a note saying that it had been transferred to the District of Massachusetts by the Defendants. (The *Process Receipt and Return* form is annexed hereto as "Exhibit 16".) On January 21, 2004 the U.S. Marshal Service mailed it back to the Plaintiff with a letter (attached as "Exhibit 17") stating that it had to bear the seal of the District Court of Massachusetts rather than seal of Barnstable Superior Court. A new summons bearing the United States District Court for the District of Massachusetts seal will be served upon the Defendant. (The U.S. Marshal's office has been quite kind to the Plaintiff, and the Plaintiff is happy with their customer service and understands perfectly the foregoing. It is mentioned here, perhaps superfluously, because the Defendants have chanted in two documents, "Nellie Mae" doesn't exist, etc., but Nellie Mae Corporation does—at the same address.)

**General Revenue Corporation:** General Revenue Corporation appears in SLM Corp.'s organizational chart (Exhibit 1) as an 100% owned corporate entity. SLM Corp. typically describes companies it owns as wholly-owned subsidiaries (please see Exhibit 3, Item A.)

**SLM Corp.:** Except for USA Funds, which it merely controls, SLM Corp. is the parent and boss of all named defendants: "SLM Holding Corporation was renamed USA Education, Inc.... USA Education, Inc. [, Sallie Mae,] is a holding company *that operates through a number of subsidiaries.*" (Please see p. 18 of The Company's year 2000 annual 10-K report filed with the SEC, affixed hereto as "Exhibit 4".) USA Education, Inc. has since been renamed to SLM Corp[4].

The Defendant SLM attempts to confuse the Court on p. 3 of their Memorandum by listing "SLMA," the Student Loan Marketing Association as a business correspondent. *SLMA* is not a named defendant, and in no way is or has been associated with the transactions being examined. SLMA and SLM are not the same companies. SLM Corporation is a private corporation listed on the NYSE, whose purpose is to make a profit, just like Enron. There are variegated and ready financial institutions eager to reap the guaranteed, not insubstantial profits of providing liquidity to the student loan market, who lament SLM Corp.'s bustled girth and purchase of competitors, in what is becoming Sherman Act like proportions (coincident with the deceptive, competitive moniker of "Sallie Mae" sounds like government). SLM Corp.'s fact-sheet states it clearly: "*SLM Corporation and its subsidiaries ... are not sponsored by or agencies of the United States.*" "You may fool all of the people some of the time; you can even fool some of the people all of the time; but you can't fool all of the people all of the time."[5] SLM Corp. is not excused from defrauding students.

## ARGUMENT

**I. First We Should Focus on Whether SLM Corp., As the Holding Company, Should Be Held Liable, Since Defendant SLM Corp. Seeks to Avoid Liability.**

On p. 3 of Defendants' Memorandum in footnote "3" Defendant cites *United States v. Bestfoods*, 524 U.S. 51, 61 (1998): " '[I]t is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries.' Accordingly, all claims should be dismissed as against SLM Corporation." **The Defendants, however, have failed to consider the very next paragraph of *United States v. Bestfoods*,** which continues[6]:

> But there is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced. ... See, *e.g., Anderson* v. *Abbott, supra*, at 362 ("there are occasions when the limited liability sought to be obtained through the corporation will be qualified or denied"); *Chicago, M. & St. P. R. Co.* v. *Minneapolis Civic and Commerce Assn.*, 247 U.S. 490, 501 (1918) (principles of corporate separateness "have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose ... of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company."

According to SLM Corp.'s organizational chart (attached hereto as "Exhibit 1"), Sallie Mae Servicing, L.P., Nellie Mae Corp. and General Revenue Corporation are 100% owned by SLM Corp. According to their annual reports, they control USA Funds.

---

[4] SLM Corp. changes its name and the names of entities within its organization with suspect regularity. As an example of this, please refer to an SEC insider filing attached hereto as "Exhibit 5".
[5] Abraham Lincoln.
[6] See also *United States v. Lehigh Valley R. R. Co.*, 220 U.S. 257, 273, 31 S. Sup. Ct. 387; *United States v. D. L. & W. R. R. Co.*, 238 U.S. 516, 35 Sup. Ct. 873.

2

In their own words: "SLM Holding Corporation was renamed USA Education, Inc.... USA Education, Inc. [, Sallie Mae,] is a holding company *that operates through a number of subsidiaries.*" (Please see p. 18 of the Company's year 2000 annual 10-K report filed with the SEC, affixed hereto as "Exhibit 4".) USA Education, Inc. has since been renamed to SLM Corp.

> In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." *Chicago, M. & St. P. R. Co. v. Minneapolis Civic and Commerce Assn.*, 247 U.S. 490, 501 (1918).

Accordingly, SLM Corporation should be held accountable for its actions and those of the companies it controls.

## II. Plaintiff's Claims Are Not Preempted by Federal Law.

Defendants' Motion to Dismiss, on p. 2, avers, "many of the Plaintiff's claims are preempted by Federal Law, which provides a detailed framework for the administration and regulation of federally-insured loans," yet they cite no supporting authority.

However, Kearns v. Tempe Technical Institute, Inc., 39 F.3d 222 (9th Cir. 1994) (finding Higher Education Act does *not* preempt state tort claims) has examined this issue: "[T]he mere existence of a detailed regulatory scheme does not by itself imply preemption of state remedies. English v. General Elec. Co., 496 U.S. 72, 87, 110 L. Ed. 2d 65, 110 S. Ct. 2270 (1990)."

On p. 9 of Defendants' memorandum in the second paragraph Defendants erroneously state that the Fair Credit Reporting Act ("FCRA") preempts State Law. However, 15 U.S.C. § 1681t(b)(1)(F)(i) of the FCRA specifically excepts Massachusetts state law:

> General exceptions...No requirement or prohibition may be imposed under the laws of any State with respect to any subject matter regulated under...section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, <u>except that this paragraph shall not apply...with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws</u> (as in effect on September 30, 1996). (15 U.S.C. § 1681t(b)(1)(F)(i))

Furthermore, the FCRA says the following, 15 U.S.C. § 1681t(a):

> Except as provided in subsections (b) and (c) of this section, this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State...except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency.

The FDCPA has a similar provision, 15 U.S.C. § 1692n:

> This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter.

The promissory note itself declares that *both* State and Federal law are guiding ("Exhibit 12B", Item B): "...State and Federal loan consolidation regulations promulgated pursuant to Section 428C of Title IV, Part B of the Higher Education Act of 1965." ("Exhibit 12B", Item C): "**Interpretation:** The terms of this loan will be interpreted in accordance with the Higher Education Act of 1965, as amended, and State law and regulations which govern the Federal Loan Consolidation Program." The content of the promissory note is approved by the

3

Secretary of Education.[7] It is clear that there is not hermetic preemption; and it is inferred that a private right of action exists, unless otherwise indicated. The language of the promissory note is of particular importance, since 34 CFR § 682.202(b)(2) states that interest can only be capitalized "...if capitalization is expressly *authorized by the promissory note* (or with the *written consent of the borrower*).

### III. Plaintiff Has a Private Right of Action. (This section addresses section I of the Defendants' memorandum.)

#### 1. There Is a Private Right of Action.

In the second paragraph of p. 6 the Defendants claim:

> As a preliminary matter, the Plaintiff has not even attempted to identify which particular regulations he alleges were violated.... Having failed to identify any specific violations, the Plaintiff claims necessarily fail.

According to *J. R. Nolan, Civil Practice* § 237, at 292 (2d ed. 1992):

> Where the cause of action is founded upon a statute, while it is preferable in plaintiff's initial pleading to cite the statute relied upon, a failure to do so is not fatal, there being no statutory requirement for such citation, and it being enough if the plaintiff sets forth the facts which bring him within the statute relied on. City of Springfield v. Com., 39 Mass. 267, 270, 207 N.E.2d 891, 893 (1965).

As for the content of the facts (J. R. Nolan, Civil Practice § 232, at 285 (2d ed. 1992): "The complaint shall contain averments which are simple, concise and direct. No technical forms of pleading are required. M.R.Civ.P. Rule 8(e)(1)."[8] The Plaintiff's complaint states in ¶ 43: "Defendants willfully increased the interest charge on his student loan...by illegally capitalizing interest on his student loan."[9]

Next, the Defendants say there is no private right of action. Under the common-law, there is a clear distinction in the cases that a private right of action was not implied and those that found an implied private right of action[10]. It was not implied when provisions were construed for the benefit of the government; or when actions were brought to induce a participating institution to make a loan when it had declined one, since there was no specific language stating that the right exists to obtain a loan without consideration of typical credit analysis; but was implied when a loan already existed and language was written specifically for the benefit of the student, as in *De Jesus Chavez v. L.T.V. Aerospace Corp.*, 412 F. Supp. 4 (1976). In *Hudson v. The Academy of Court Reporting*, 746 F. Supp. 718 (1990), the court examined in detail both *Phillips* and *Chavez*:

> ...Phillips v. Pennsylvania Higher Ed. Assistance Agency, 497 F. Supp. 712 (1980) ... In that case the District Court held that "[a] statute such as the Higher Education Act with many beneficiaries must be analyzed in terms of the provisions alleged to be the basis of action." Essentially, by stating that, the Court has found the holding in DeJesus Chavez to be overly broad. The Phillips Court found that the proper application of the first part of the Cort v. Ash test is to determine if the relevant rule or statute itself is one in which the plaintiff is "one of the class for whose especial benefit the statute was enacted." DeJesus Chavez simply found that the entire Higher Education Act provided the plaintiff with an implied right to bring suit, rather than looking at the specific relevant section of the Act. Nonetheless, the Phillips Court [*721] interpreted [**9] the holding in DeJesus Chavez to have analyzed the specific relevant code section and to have concluded that the student has standing since the relevant code section dealt with the applicable interest rate which obviously effects the student that repays the loan. However, nowhere in the DeJesus Chavez opinion was such a specific finding made.

---

[7] "The guaranty agency must use common application forms, promissory notes, Master Promissory Notes (MPN), and other common forms approved by the Secretary." 34 CFR § 682.401(d)(3).
[8] This action was filed in Barnstable Superior Court, and was subject to M.R.Civ.P.
[9] 34 C.F.R. § 682.202(b)(2) circumscribes precisely when and only when interest may be capitalized, as is more fully discussed on the next page of this memorandum.
[10] *Phillips v. Pennsylvania Higher Ed. Assistance Agency*, 497 F. Supp. 712 (W.D.Pa. 1980): "The Higher Education Act, however, was enacted for the benefit of others in addition to students. [**35] The Chavez case involved a violation of statutory provisions enacted for the benefit of students, specifically interest rate regulations.... The due diligence provision, unlike the interest rate regulations in Chavez, was enacted for the benefit of the federal government."

> With that in mind, the Phillips Court in analyzing its own case looked at the specific terms of the provision alleged to be the basis of the action... This Court believes the holding in DeJesus Chavez was overly broad and that these types of cases necessitate scrutinizing and [**12] analyzing the specific relevant code section, statute or regulation to determine whether such a private cause of action is implied. This would follow the reasoning in Phillips and virtually every case decided since DeJesus Chavez.

In the present case a loan *has* been made and there exists a lender-borrower relationship. The Plaintiff's complaint states in ¶ 17: "On August 18, 2000, Plaintiff's consolidation loan entered default status;" in the next sentence states "interest was calculated on an amount not agreed upon;" and continues in ¶ 43: "Defendants willfully increased the interest charge on his student loan...by illegally capitalizing interest on his student loan." The Secretary and the Department of Education have set forth a detailed enumeration of <u>when and only when</u> interest can be capitalized. In 34 CFR §§ 682.202(b)(2) and 682.202(b)(3), beginning with the opening statement of 34 CFR 682.202 (please note item (2)(iii), since this is of particular importance in calculations):

> "The charges that lenders may impose on borrowers, either directly or indirectly, are limited to the following:
> ...
> (2) ...a lender may capitalize interest payable by the borrower that has accrued—
>   (i) For the period from the date the first disbursement was made to the beginning date of the in-school period;
>   (ii) For the in-school or grace periods, or for a period needed to realign repayment of an SLS with a Stafford loan, if capitalization is expressly authorized by the promissory note (or with the *written consent of the borrower*);
>   (iii) For a period of authorized deferment;
>   (iv) For a period of authorized forbearance; or
>   (v) For the period from the date the first installment payment was due until it was made.
> (3) ...Capitalization is again permitted when repayment is required to begin or resume."

Also notice the words "if capitalization is expressly authorized by...written consent of the borrower" in 34 CFR § 682.202(b)(2)(ii). Clearly, the borrower is given authority here; however, this is the Department of Education's interpretation of Congress' Higher Education Act. We must also look to the Higher Education Act itself to determine if an implied private right of action exists.

An implicit private right of action within the Higher Education Act states in 20 U.S.C. § 1077(c)(1)(C): "A consolidation loan made on or after July 1, 1994, shall bear interest at an annual rate on the unpaid principal balance of the loan." *Cort v. Ash*, the touchstone for a private right of action, in regard to the second part of the test for an implicit right of action said:

> It is at least dubious whether Congress intended to vest in the plaintiff class [a private right of action]...the fact that there is no suggestion at all that § 610 may give rise to a suit for damages or, indeed, to any civil cause of action, *Cort v. Ash*, 95 S.Ct. 2080 (1975);

In *Alexander v Sandoval*, 532 U.S. 275, 286 (2001), the Supreme Court reaffirmed that *Cort v. Ash* is still the standard, and has not changed.

Another implied private right of action exists in 20 U.S.C. § 1078-3(d)(4): "The Secretary is *authorized to promulgate such regulations* as may be necessary to facilitate carrying out the provisions of this subsection." (emphasis added.) The Secretary, by power vested in him by Congress, gave an implicit, if not express, private right of action to the borrower with the words "with the written consent of the borrower." 34 CFR § 682.202(b)(2)(ii).

Of particular note is the Defendants' incomplete analysis of their cite of *McCulloch v. PNC Bank*, 298 F.3d 1217, 1226 (11th Cir. 2002). In that case "[a]lthough the Eleventh Circuit has not addressed whether a private right of action exists under HEA," the Court relied upon "the Supreme Court's ruling in *Touche Ross & Co. v. Redington*,

5

which requires some affirmative evidence of congressional intent to create a private right of action." The first thing to note is that the *McCulloch v. PNC Bank* case falls under the classification described in *Hudson*[11] as <u>not</u> a "clearly articulated right":

> ...in applying the Phillips rationale, it is the language contained in 34 CFR § 682.604(d) that is to be scrutinized to determine if a federal right exists. Essentially the regulation dictates when and how the loan proceeds held by the educational institution are to be applied. In reviewing the rule, it is clear that the intent of the Legislature was to protect the government and the lending institution from the misapplication of the loan proceeds toward purposes not intended and unrelated to education. Therefore, this Court, in applying the Phillips line of reasoning and scrutiny, concludes that the regulation was not enacted to benefit the plaintiff, and thus it does not create a federal right in favor of plaintiff. The plaintiff is unable to indicate a clearly articulated federal right.

In the case sub judice, such a right exists in 20 U.S.C. 1077(c)(1)(C) and 34 CFR § 682.202(b)(2), as is listed in detail on the foregoing page by the Plaintiff. The next point of importance in *McCulloch v. PNC Bank*'s reliance upon *Touche Ross & Co. v. Redington*, 99 S.Ct. 2479 (1979), is that in *Redington* the focus by the Supreme Court was § 17(a):

> Every national securities exchange, every member thereof, ... and every broker or dealer registered pursuant to ... this title, shall make, keep, and preserve for such periods, such accounts, correspondence, ... and other records... In the District Court's view, § 17(a) was essentially a bookkeeping provision. By its terms, it did not impose any duty on accountants.

The court states that a civil remedy would be permitted if among purchasers and sellers of securities, but was instead an action by a purchaser against an outside accounting firm, not the seller, perpetrator. "§ 17(a) is by its terms limited to purchasers and sellers of securities." 99 S.Ct. 2479 (1979). The Supreme Court in *Touche Ross & Co. v. Redington* characterizes the type language that does allow a private right of action:

> It is true that in the past our cases have held that in certain circumstances a private right of action may be implied in a statute not expressly providing one. But in those cases finding such implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties. E.g., *Cannon v. University of Chicago, supra* (20) U.S.C. § 1681); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (42 U.S.C. § 1981); *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (15 U.S.C. § 78j(b)); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (42 U.S.C. § 1982); *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (42 U.S.C. § 1973c); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (42 U.S.C. § 1982); *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (15 U.S.C. § 78n(a)). By contrast, § 17(a) neither confers rights on private parties nor proscribes any conduct as unlawful....The intent of § 17(a) is evident from its face. Section 17(a) is like provisions in countless other statutes that simply require certain regulated businesses to keep records.

The United State Supreme Court well described a test for private remedy in *Suter v. Artist M.*, 503 U.S. 347 (1992):

> ...the provision creates an enforceable right unless (2) the provision "reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation..." 496 U.S., at 509 (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 19 (1981)), or unless (3) the plaintiff's interest is so " 'vague and amorphous' " as to be " 'beyond the competence of the judiciary to enforce.' " 496 U.S., at 509 (quoting *Golden State*, 493 U.S., at 106, and *Wright*, 479 U.S., at 431-432).

It is easily discernible that "A consolidation loan made on or after July 1, 1994, shall bear interest at an annual rate on the unpaid <u>principal balance of the loan</u>,"[12] and "the charges that lenders may impose on borrowers, either directly or indirectly, <u>are limited to the following...a lender may capitalize interest payable by the borrower that has accrued...for a period of authorized deferment</u>,"[13] is very clear in creating a binding obligation that is certainly not vague and amorphous, and which can only be excused "<u>if

---

[11] *Hudson v. The Academy of Court Reporting*, 746 F. Supp. 718 (1990). (Plaintiff did not make the applicable case law: no offense regarding the name of the case.)
[12] 20 U.S.C. § 1077(c)(1)(C).
[13] 34 CFR §§ 682.202 and 682.202(b)(2)(iii)

6

capitalization is expressly authorized by...written consent of the borrower,"[14] (emphasis added) *or the promissory note the borrower signed.* Note the promissory note as having authority. (The Defendants have made no claim—and none is prima facie available—that the promissory note permitted the capitalization of interest.)

On p. 7 of their memorandum the Defendants inaccurately state, "Because the Secretary of Education has *exclusive* authority...." (emphasis added by Plaintiff.) The term *exclusive* is the Defendants' own construction and does not exist in the statute. The Defendants next cite *Slovinec v DePaul Univ.*, 332 F.3d 1068, 1069 (7th Cir. 2003). The *Slovenic* case is another case that falls under the description by the Supreme Court as having an interest that is vague and amorphous. The Higher Education Act does not give Slovenic the right to a job, which is why no private right of action was found, as is summarized in the head notes: "The Court of Appeals held that neither HEA nor FERPA authorized litigation by a private plaintiff against a private university for its alleged failure to assist him in obtaining full-time employment." As the Supreme Court stated: "[I]n those cases finding such implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties."[15] The Defendants' next cited case, *L'ggrke v. Benkula*, 966 F.2d 1346, 1348 (10th Cir. 1992), fails for the same reason. The Defendants then list 20 U.S.C. § 1082(b), averring that it is relevant. It is not. Nothing in § 1082(b) is even remotely related to the theory of their presentation:

> (b) Financial operations responsibilities
> The Secretary shall, with respect to the financial operations arising by reason of this part prepare annually and submit a budget program as provided for wholly owned Government corporations by chapter 91 of title 31. The transactions of the Secretary, including the settlement of insurance claims and of claims for payments pursuant to section 1078 of this title, and transactions related thereto and vouchers approved by the Secretary in connection with such transactions, shall be final and conclusive upon all accounting and other officers of the Government. 20 U.S.C. § 1082(b).

Perhaps the only item they were seeking is the phrase "wholly owned Government corporations," to allude that the Defendants are somehow related to the Government. They are not: the government requires the Defendants to state that they are neither agencies of nor sponsored by the U.S. Government. This is another attempt by the Defendants to fool the Court.

After their tangential, out in right field mention of 20 U.S.C. § 1082(b), the Defendants cite *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484-85 (9th Cir. 1995). This case fits within the classification of cases with no clearly defined benefit. From page 1484: "the HEA was enacted to benefit students...schools are not among the class for whose especial benefit the statute was enacted." *Symington* also defers to the Secretary of Education as having enforcement rights. For the subject matter of the case sub judice, in the Secretary's legal capacity he gave authority to the student loan borrower in regard to excess charges: "if capitalization is expressly authorized by...written consent of the borrower."[16] So, when the Defendants' captioned the associated section of their memorandum as "There Is No Private Right of Action for the Alleged Violations of Regulations Promulgated by The Department of Education," just what regulations were they reading? Since 34 CFR § 682.202(b)(2) is a regulation promulgated by the Department of Education, it would appear that there is a private right of action.

---

[14] 34 CFR 682.202(b)(2)(ii)
[15] *Touche Ross & Co. v. Redington*, 99 S.Ct. 2479 (1979).
[16] 34 CFR 682.202(b)(2)(ii)

Without notice or authorization, the Defendants increased the penalty amount on his consolidation loan by $1384.56. On August 18, 2000, the correct penalty amount of $6580.29 was applied to his loan (refer to "Exhibit 6", attached). The Dept. of Education limits the amount of penalty that can be added to a student loan to 18.5% (see "Exhibit 7" attached). Indeed, on the very letter (Exhibit 6) where the penalty amount is listed as $6580.29, at the bottom of the page in item 2 is: "Collection costs that could be added to your loans would be limited to 18.5%." And 18.5% is within five dollars of what was charged.[17]

As is stated in the complaint, at some later date, without providing notification, Sallie Mae Serving, L.P. augmented the penalty amount by $1384.56. Even nine months after continuous requests for an itemization of charges added to the Plaintiff's loan, on August 19, 2003, the Defendants General Revenue Corporation, Sallie Mae Servicing, L.P., SLM Corp., USA Funds and Nellie Mae (Plaintiff called and/or wrote all of them many times) still did not provide an accounting (please see two-sided letter sent to Plaintiff, attached as "Exhibit 8A" and "Exhibit 8B"). On September 16, 2003, ten months later, the Defendants sent a partial itemization (please see "Exhibit 9"), yet they refused to furnish the dates and amounts of capitalization, the smoking gun. However, this document does list the penalty amount as $7964.85, which is $1384.56 higher than the 18.5% ostensibly permitted by the Dept. of Education.

Finally, on December 11, 2003 (postmarked DEC 15'03), after Mr. Gibbs informed them that he had filed a multi-billion dollar lawsuit (which he had said for months that he would do, both in writing and on the telephone), the Defendants sent him the itemization he had asked for (attached hereto as "Exhibit 10"). From this document, Mr. Gibbs was able to nail down the precise amount of interest overcharge. Accordingly, he amended his complaint to reflect this figure, after receiving this information, on December 23, 2003. (The Plaintiff also separated the elements of Count I into Counts I and II, since he was now able to determine with particularity the figures for interest that he would not have had to pay in deferment and the illegally capitalized interest).

The foregoing brings us to an important point: why the suit amount was adjusted to $23 billion. In the initial complaint Mr. Gibbs had estimated the number of class members to be 650,000 persons, as is reflected in the calculations that resulted in the dollar amounts for Counts II and III of his initial complaint, though he described the class size as exceeding 10,000 persons.[18]

---

[17] $35,545.37 x 0.185 = $6575.89. $6580.29 − $6575.89 = $4.40 (maybe there's an unspecified late fee or something; but close enough, the Plaintiff has no problem with the unexplained variation.)

[18] 4000 x 650,000 = 2,600,000,000; and 1384.56 x 650,000 = 899,964,000; which are the amounts listed in Counts II and III of the initial complaint, respectively. The "enormous sum" the Defendants mention on p. 1 of their memorandum, is less than half the amount it would have been in the initial complaint if Mr. Gibbs had used the 650,000 multiplier in Count I, since Mr. Gibbs listed $100,000 in damages individually, and only $10,000,000 for the class. ($100,000 is far less than what negative credit injures him, since it prevents him from becoming a licensed mortgage broker in his home state, something that cost him a minimum of $37,000 last year alone, not including projected lost earnings of over $450,000/yr. if he had his license: $37,000 that he can identify with receipts, which figure does not include lost opportunity costs for not being able to be hired by any company that utilizes credit as a criterion, etc. Mr. Gibbs is a multi-talented individual, and has had to shelve six-figure job solicitations on several occasions. The point is $100,000 is a low figure.) Anyway, 100,000 x 650,000 = 65,000,000,000 ($65 billion). Added to Counts II and III of the initial complaint would have made the total $68,499,969,384.60; so, the Plaintiff felt this was too high, and simply lowered it arbitrarily. But it is important to note, the amounts of the amended complaint of 01/05/04 are not arbitrary, they are specific calculations of deferred interest, $5849.37; capitalized interest, $939.79; and excess penalties, $1384.56; multiplied by 650,000 individuals. The class size of approximately 650,000 is derived from Dept. of Education publications, and may be higher or lower. Attached as "Exhibit 13" is a GAO table of defaulted student loans for 1990-2001. From this table we can determine the weighted average default rate expressed as a percentage. Applying weights linearly, beginning at one for the most recent year, and incrementing the weight by one per year, we have a weight of 12 for 1990 and 1 for 2001, under the theory that seasoned default rates are likely more predictive of what default rates will be in near future—a necessary determination since the aggregate dollar amount in student loans per year has increased from $54.1 billion in 1990 to $233.2 billion in 2001, which masks the percentage of defaulted loans (and is how President Clinton was able to say that

8

**2. The Plaintiff Has a Private Right of Action for Mail Fraud, As Decided by the United States Supreme Court. (This section addresses section II, 2 of the Defendants' memorandum.)**

The Defendants, on p. 7 of their memorandum decry: "It is wholly unclear what the Plaintiff means by 'lulling letters.'" The Plaintiff would direct them to *United States v. Spielberger, D.C.Va.*, 28 F. Supp. 380, 382:

> Another and a very persuasive reason for overruling this demurrer is found in what is often called (in this connection) "the doctrine of lulling letters". This doctrine is clearly set forth in *Preeman v. United States*, 7 Cir., 1917, 244 F. 1, 9: "The scheme alleged being one for obtaining money through the fraudulent representations and practices set forth, the use of the mails, even after the money is received, for the purpose of assisting in retaining the money, or to convey to the victim assurances calculated to lull him into inaction and to postpone, perhaps indefinitely, his taking action in respect to his loss, is within the purview of the law which condemns depositing or taking [*383] from the mails any letter, etc., for the purpose of executing any scheme to defraud." And to the same effect, see *Bogy* [**7] *v. United States*, 6 Cir., 1938, 96 F.2d 734, 740; *Lewis v. United States*, 9 Cir., 1930, 38 F.2d 406, 416.

In evaluation of the letters, the Court quotes:

> Mr. Justice Brewer in *Durland v. United States*, 1896, 161 U.S. 306, 315, 16 S.Ct. 508, 512, 40 L.Ed. 709: "We do not wish to be understood as intimating that, in order to constitute the offense, it must be shown that the letters so mailed were of a nature calculated to be effective in carrying out the fraudulent scheme. It is enough [**6] if, having devised a scheme to defraud, the defendant, with a view of executing it, deposits in the post office letters, which he thinks may assist in carrying it into effect, although in the judgment of the jury, they may be absolutely ineffective therefore."

Each time the Defendants sent/send out a bill or statement to a student loan borrower that purposefully misstates the accurate balance that they owe it is mail fraud, as defined by statute and as supported by common law. The Plaintiff alleged, in addition to being sent statements with the incorrect balance:

> The Defendants committed numerous counts of Federal Mail Fraud in violation of federal statute 18 U.S.C. § 1341 by sending lulling letters designed to prevent students from seeking justifiable and equitable relief in a court of law. (Count VIII, ¶ 47 of Plaintiff's complaint.)

The Defendants, after claiming to be befuddled by the term "lulling letters", then go on to advise the Court, "the Court need wade no further; the Mail Fraud Statute is a bare criminal statute with no private right of action." The Court may want to wade, since the United States Supreme Court has already tested the waters in *Sedima, S. P. R. L. v. Imrex Co.*, 473 U.S. 479 (1985), in which the majority opinion specifically overruled the first case cited by the Defendants', *Ryan v. Ohio Edison Co.*, 611 F.2d 1170 (6th Cir. 1979), according to the dissent.[19] Notwithstanding the dissenting opinion, the law of the land is *Sedima*:

> The language of RICO gives no obvious indication that a civil action can proceed only after a criminal conviction. The word "conviction" does not appear in any relevant portion of the statute. See 1961, 1962, 1964(c). To the contrary, the predicate acts involve conduct that is "chargeable" or "indictable," and "offense[s]" that are "punishable," under various criminal statutes. 1961(1). As defined in the statute, racketeering activity consists not of acts for which the defendant has been convicted, but of acts for which he could be.

---

he had lowered the default rate to 5%)—that predictively will occur, from historical data. The result: 18.52%, which is simply a coincidence that it is nearly identical to the 18.5% penalty allowed by the Department of Education. Wait, no, it probably isn't. (Although they may arrive at the average percentage of defaulted student loans differently, it may well be that penalties are set at a level that meets the rate of default expressed in terms of dollars. Well, this certainly an epiphany, although the method of application of weighted averages is fairly standardized in business classes.) Next, apply this percentage to the to the portfolio of loans serviced by the Defendants. Sallie Mae, on its website, says it services over 7 million borrowers. 7,000,000 x 0.1852 = 1,296,400 borrowers in default. (Note that it isn't actually possible to equate a dollar value percentage as a number of borrowers percentage, but it's an estimate.) Next, divide this in half, so that we are estimating on the low side, by choosing a 50% margin of error and you come up with 648,200 individuals, or approximately the 650,000 that the Plaintiff initially used in his calculations. Yes, it is an enormous sum, because it directly correlates with staggering sum they've siphoned off of students. The actual numbers can be determined through discovery, of course.

[19] Prior to RICO, no federal statute had expressly provided a private damages remedy based upon a violation of the mail or wire fraud statutes, which make it a federal crime to use the mail or wires in furtherance of a scheme to defraud. See 18 U.S.C. 1341, 1343. Moreover, the Courts of Appeals consistently had held that no implied federal private causes of action accrue to victims of these federal violations. See, e. g., Ryan v. Ohio Edison Co., 611 F.2d 1170, 1178-1179 (CA6 1979) (mail fraud)... Under the Court's opinion today, two fraudulent mailings or uses of the wires occurring within 10 years of each other might constitute a "pattern of racketeering activity."... Before RICO, of course, the plaintiff could not have recovered under federal law for the mail or wire fraud violation.

9

RICO defines [in 18 U.S.C. § 1961(1)] "racketeering activity" to mean "...(B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to mail fraud).

The Defendants' cite of *White v. Apollo Group*, 241 F.Supp.2d 710 (W.D. Tex. 2003) is inconsequential: a lower court cannot overrule the U.S. Supreme Court.

### IV. The Plaintiff's Claim Is Neither Barred by the Fair Credit Reporting Act, Nor the Fair Debt Collection Practices Act. (This section addresses section II. of the Defendants' memorandum.)

#### a. The FCRA, the FDCPA and M.G.L.

Page 8 of Defendants' memorandum says that neither allegation in ¶¶ 39(a) and (b) is sufficiently pled. Immediately following Count III is: "Plaintiff realleges and incorporates herein paragraphs 1 through 36 of this complaint." ¶ 31 of complaint states:

> The collection agency [General Revenue Corporation] repeatedly violates federal law by making misrepresentations that run the gamut from the absurd, 'There is no federal law about student loans' (when questioned about their practices) to the plausible, but specious; and by excessive harassment, belligerence and prevarication which varies per phone call, wherein representatives say whatever they like, often disagreeing with each other. This appears to be a game to the employees...

¶ 39(b) continues:

> Negligent hiring, training and supervision. Defendants negligently did not properly supervise, monitor nor provide adequate training for employees regarding credit collection practices, as set forth in the Fair Credit Debt Collection Practices Act.

> 15 U.S.C. § 1692e: "A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt." § 1692d: "A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Etc.

As previously noted in section III of this memorandum[20]:

> Where the cause of action is founded upon a statute, while it is preferable in plaintiff's initial pleading to cite the statute relied upon, a failure to do so is not fatal, there being no statutory requirement for such citation, and it being enough if the plaintiff sets forth the facts which bring him within the statute relied on. City of Springfield v. Com., 39 Mass. 267, 270, 207 N.E.2d 891, 893 (1965).

On p. 9 of Defendants' memorandum: "The Amended Complaint alleges that '[o]n October 4, 1992'...Insofar as the Plaintiff discovered the alleged negligence in 1992—more than eleven years ago—his claim is barred by the statute of limitations." Just how much time can we waste on a typo? No matter: the Plaintiff is quite willing to make this allegation in a new complaint filed in Barnstable Superior Court under state law only (M.G.L. c. 93 §§ 54A and 63), along with every month of misreported credit information in a separate count, but for less than $75,000.00 in damages with only the Plaintiff listed, without mention of a prospective class (to be sought after surviving a motion to dismiss), so that the case can be pleaded with the correct date of 2002, since an allegation not pleaded cannot be dismissed, with or without prejudice. Plaintiff would then entertain a motion to consolidate.

But we need not be so melodramatic. Since the Plaintiff has included other details of negligent credit reporting (i.e., the incorrect date of default, which affects both the 7-year duration of credit entries and the computation of his credit scores—a component of fico scores is how recently negative credit appears), this window gives him the latitude to show all negligent reporting.[21] Attached as "Exhibit 11A" and "Exhibit 11B" are two pages from Plaintiff's credit report date 10/04/02. "Exhibit 11A" shows two duplicate entries for the consolidation loan, but with different Defendants (i.e., one says $47,856 is owed to Nellie Mae FNB and the other says $47,856 is owed to USA Funds.) "Exhibit 11B" shows the amount of installment debt due to this error. It is doubled to $99,687.00.

---

[20] J. R. Nolan, Civil Practice § 237, at 292 (2d ed. 1992)
[21] See Cantara v. Massachusetts Bay Transp. Authority, 3 Mass.App.Ct. 81, 87, 323 N.E.2d 759, 764 (1975)

The Defendants again claim (on p. 9) that state law "is pre-empted by Federal Law." For disputation, please refer to section II of this memorandum, which shows that no preemption exists in either the FCRA or the FDCPA.

On p. 10, the Defendants state "...the plaintiff does not make any attempt to identify which Defendant allegedly made these reports to the credit bureaus. This is a false statement by the Defendants. In ¶¶ 25 & 26 of Plaintiff's complaint:

> Mr. Gibbs continued to communicate with GRC via telephone in an attempt to correct the balance and inaccurate history. GRC stated that Nellie Mae reported to the credit bureaus, and to speak to them if it was inaccurate... Mr. Gibbs contacted Nellie Mae, who said GRC was responsible for reporting to the credit bureaus.

The Plaintiff stated in the introduction of his complaint that "the Defendants ... appear to operate as a joint enterprise." SLM Corp., when not before a judge, agrees: "[SLM Corp.] is a holding company *that operates through a number of subsidiaries.*"[22] Since SLM Corp., as described on the previous page is responsible under common law for the actions of the companies it completely controls, the distinction of which companies did what becomes moot. Their hot potato scheme of pointing fingers back and forth among companies is a sham.

On p. 11 of the Defendants' memorandum, Defendants state, "There are no facts pled to suggest that one or more of the Defendants did anything more than comply with the HEA statutory requirement." Unless, of course, they read ¶¶ 18, 19, 20 (with inference), 21, 22, 25, 26, 29, 30, 31, 32, 34, 36, 39, 40, 42, 43 and 48 for suggestions.

The Defendants go on to discuss the Fair Debt Collection Practices Act ("FDCPA") on p. 12 of their memorandum and include three cases attached to their memorandum. However, notably in *Elder v. Student Loan Marketing Association* (not a present defendant and not SLM Corp.) preemption specifically ruled upon loan collection activities exclusive of debt collectors, but not by debt collectors. Furthermore, the court held that a *debt collector* would be subject to the FDCPA. Although the defendant in that case, Student Loan Marketing Association, was not a debt collector, General Revenue Corporation and USA Funds, Defendants in the present case, admittedly, are.[23] *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996) *cert. denied,* (521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997): "We hold that USA Funds, as a private guaranty agency under contract with the federal Department of Education to guarantee student loans, is subject to the FDCPA. [the guarantee agency] is a private nonprofit organization with a government contract; it is not a government agency or employee."

The Defendants go on about more preemption and exemption. The doctrine of preemption is, not surprisingly, misapplied by the Defendants. As this Court has ruled in Philip Morris, Inc. v. Harshbarger, 122 F.3d 48, 87 (1st Cir. 1997):

> The pre-emption doctrine is rooted in the Supremacy Clause of the United States Constitution: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "It is basic to this constitutional command that all conflicting state provisions be without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981).

> This does not mean, of course, that the States may not enact legislation dealing with the same subjects as federal law, or that a particular matter may not be the subject of simultaneous federal and state regulation. *See Retail*

---

[22] See excerpt from 10-K report filed with the SEC, attached as Exhibit 4.
[23] From p. 4 of the Defendants' memorandum, under the section "Facts": "General Revenue Corporation ("GRC") is...[a] collection agency." *Brannan v. United Student Aid Funds, Inc.*, 94 F.3d 1260, 1263 (9th Cir. 1996) *cert. denied,* (521 U.S. 1106, 117 S.Ct. 2484, 138 L.Ed.2d 992 (1997): "USA Funds concedes ... that it is a 'debt collector' under the FDCPA."

11

*Clerks Int'l Ass'n v. Schermerhorn*, 375 U.S. 96, 103-104 (1963). The existence of a federal interest in regulating the matter does not exclude the possibility of a legitimate concurrent state interest.

But we need not delve further into constitutional law. Both the FCRA and the FDCPA explicitly allow for state law and neither exempt negligent conduct, brought under M.G.L. c. 54A, nor willful conduct. (Please see section II of this memorandum.) General Revenue Corporation is subject to the FDCPA, 15 U.S.C. 1692 et seq.; SLM Corp., Sallie Mae Servicing, L.P. and General Revenue Corporation are subject to M.G.L. c. 93 § 63; SLM Corp.[24], Sallie Mae Servicing, L.P., General Revenue Corporation, USA Funds and possibly Nellie Mae are subject to M.G.L. c. 93 § 54A; SLM Corp. and Sallie Mae Servicing, L.P. are subject to the FCRA, 15 U.S.C. § 1681h(e).

Defendants continue to place inaccurate information on Plaintiff's credit report, for which the statute of limitations for the FDCPA (one year), FCRA (two years or indefinitely[25]), and M.G.L. c. 93 §§ 54A, 63 (two years or indefinitely[26]) continues to move forward.

Lastly, on p. 13 in footnote 13 of Defendants' memorandum, Defendants claim:

> [T]he Plaintiff has failed to allege: (i) which of the Defendants was allegedly negligent in training and supervising their employees; (ii) what duty, if any, these Defendants owed to him; (iii) or that any alleged injury was proximately caused by the alleged negligence.

**In re (i):** From ¶ 31 of Plaintiff's complaint (note that the bracketed statement "General Revenue Corporation" appears in the complaint with brackets):

> The collection agency [General Revenue Corporation] repeatedly violates federal law by making misrepresentations that run the gamut from the absurd, 'There is no federal law about student loans' (when questioned about their practices) to the plausible, but specious; and by excessive harassment, belligerence and prevarication which varies per phone call, wherein representatives say whatever they like, often disagreeing with each other. This appears to be a game to the employees....

From Count III of complaint: "Plaintiff realleges and incorporates herein paragraphs 1 through 36 of this complaint," which would include ¶ 31.

**In re (ii):** Duty is proscribed by statute in the FDCPA, 15 U.S.C. § 1692 et seq.: "It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors."

**In re (iii):** From ¶ 39 of Plaintiff's complaint: "The injuries sustained by the Plaintiff, Kipp Gibbs, were directly and proximately caused by the negligence of the Defendants." Here, harassment is clearly defined as pertaining to General Revenue Corporation, as stated in ¶ 31 of complaint. ¶ 39, a of Plaintiff's complaint states, "Defendants engaged in negligent and tortious reporting to credit bureaus." Both Nellie Mae and General Revenue Corporation each said the other was responsible for the inaccurate credit reporting, as is stated in ¶¶ 25 and 26 of Plaintiff's complaint. It is still unclear exactly which entity is responsible for the inaccurate reports. Massachusetts state law does not bar any of them, and the FCRA defines a specific allowance of cases brought under Massachusetts law.[27]

**b. Elements That Differentiate the Three Cases Included by the Defendants from the Case Sub Judice.**

**(1) *Schwaeble v. Sallie Mae Servicing, L.P.***

---

[24] Per common law liability as set forth in *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).
[25] [W]ithin two years from the date on which the liability arises, except that where a defendant has materially and willfully misrepresented any information required under this subchapter to be disclosed to an individual and the information so misrepresented is material to the establishment of the defendant's liability to that individual under this subchapter, the action may be brought at any time within two years after discovery by the individual of the misrepresentation. 15 U.S.C. § 1692p.
[26] M.G.L. c. 93 § 65.
[27] 15 U.S.C. § 1681t(b)(1)(F)(i)).

The Defendants in the present case say in footnote 12 of on p. 12 of their memorandum:

> *See also Schwaeble v. Sallie Mae Servicing, L.P.*, 3:02 CU-84 (M.D. Ga. November 5, 2003) (dismissing FDCPA claim against Sallie Mae Servicing where loan was not in default when Sallie Mae obtained the loan for servicing).

*Schwaeble v. Sallie Mae Servicing, L.P.*:

> It is true that Plaintiff specifically alleges in his complaint that Defendant North Shore is a "debt collector" for purposes of the FDCPA, but makes no such allegation against Defendant Sallie Mae [Servcing, L.P.]... Because Defendant Sallie Mae [Servicing, L.P.] was collecting a debt owed to itself and not collecting the debt on the behalf of anyone else, it does not satisfy the term "debt collector." The FDCPA only restricts the actions of "debt collectors."

The following a <u>key differences</u> between *Schwaeble* and the case sub judice:

(i) Defendant General Revenue Corporation is a debt collector;

(ii) The *Schwaeble* case was not dismissed against North Shore Agency, Inc., a debt collector;

(iii) 15 U.S.C. § 1692n of the FDCPA: "This subchapter does not annul, alter, or affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State with respect to debt collection practices, except to the extent that those laws are inconsistent with any provision of this subchapter, and then only to the extent of the inconsistency. For purposes of this section, a State law is not inconsistent with this subchapter if the protection such law affords any consumer is greater than the protection provided by this subchapter;

(iv) Massachusetts law provides such protection in M.G.L. c. 93 §§ 54A and 63;

(v) In *Schwaeble* no allegation was made as to the intentional or errant overcharge and associated false reporting of such overcharge;

(vi) 15 U.S.C. § 1681t(b)(1)(F)(i) of the FCRA specifically allows cases under M.G.L. § 54A: "General exceptions...No requirement or prohibition may be imposed under the laws of any State with respect to any subject matter regulated under...section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies, <u>except that this paragraph shall not apply...with respect to section 54A(a) of chapter 93 of the Massachusetts Annotated Laws</u> (as in effect on September 30, 1996)";

Accordingly, Defendants SLM Corp.[28], Sallie Mae Servicing, L.P., General Revenue Corporation and Nellie Mae should not be dismissed from Count III of Plaintiff's complaint. Also of note, in *Schwaeble* the Court denied Defendant Sallie Mae Servicing, L.P.'s motion to dismiss: "Therefore, the Court HEREBY DENIES Defendant's Motion to Dismiss on the remaining FCRA claims.

The Defendant's inclusion of *Schwaeble* is quite helpful; from pp. 11 and 12 of same:

> The language of the Plaintiff's complaint is not clear as to whether Plaintiff is bringing a claim under subsection (b) of this section of the FCRA, but the Court is willing to broadly interpret Plaintiff's complaint and assume that Plaintiff is bringing a claim under this subsection....
>
> The civil liability sections, 15 U.S.C. § 1681n and 1681o, explicitly provide for a private right of action for consumers wishing to enforce any provision of the Fair Credit Reporting Act against "any person" who either "willfully fails to comply" or is "negligent in failing to comply." Absent any explicit limitation, the plain language of 15 U.S.C. §§ 1681n, 1681o, 1681s-2(b) and (c) provide a private right of action for a consumer against furnishers of information who have willfully or negligently failed to perform their duties upon notice of a dispute. Furthermore, the negative inference of explicitly precluding a consumer's right of action for violations of § 1681s-2(a) is that they are preserved in § 1681s-2(b). Accordingly the plain language of the Fair Credit Reporting Act compels the conclusion that there is a private right of action for consumers to enforce the investigation and reporting duties imposed on furnishers of information.

### (2) *Jeffrey Brumberger v. Sallie Mae Servicing Corp.*

The *Brumberger* is differentiated from the present case for the same reasons as listed in (i), (ii), (iii), (iv) and (vi) of Section IV(b)(1), next above. In regard to item (v), *Brumberger* and *Schwaeble* conflict in their determination of a private right of action in regard to 15 U.S.C. 1681s-2 et seq. <u>Since *Brumberger* was located in Louisiana, the specific Massachusetts exception in 15 U.S.C. § 1681t(b)(1)(F)(i) of the FCRA was not pertinent, but is in the case sub judice.</u>

---

[28] Per common law liability as set forth in *United States v. Bestfoods*, 524 U.S. 51, 61 (1998).

13

**(3) *Elder v. Sallie Mae, et al.***

The *Elder v. Sallie Mae, et al.* claim is thoroughly useless and it is wondered why it is even included as an attachment. Nonetheless, the following are the distinguishing factors between *Elder* and the case sub judice:

(i) The suit was against the Student Loan Marketing Association, not SLM Corp. or any of its private corporations;

(ii) Elder called the Defendants "credit reporting companies," which, clearly, they are not;

(iii) Elder also said the Defendants were "debt collectors," also n/a;

(iv) Elder later called them "consumer reporting agencies" (commonly known as credit bureaus);

(v) Since none of the defendants were debt collectors, they were not subject to the FDCPA;

(vi) The case was decided in the District of Columbia, which does not have the FCRA exception that Massachusetts does;

(vii) The *Elder* case dealt with the Higher Education Act and required due diligence for collection of student loans, which does not permit, and does not claim to permit, usurious interest charge or the increase of penalties in contradiction to stated policies. Clearly, neither the Secretary nor Congress in any way intended to give license to wayward lenders to simply increase balances at will arbitrarily; in fact, each enacted provisions to prevent it.[29]

It would seem that the Defendants would like the Court to wade into water they've attempted to muddy, but not to wade into the clear water of U.S. Supreme court opinions and the RICO statutes, which encompasses mail fraud.

For example, in footnote 11 on p.10 of the Defendants' memorandum they cite *Yeager v. TRW, Inc.*, 984 F.Supp. 517, 523. Ostensibly included to confuse the Court, since the Defendants in the case sub judice are not credit reporting agencies (a.k.a. credit bureaus), whereas the defendant in *Yeager v. TRW, Inc.* was, and hence subject to the qualified immunity that the Defendants toss around, as though it's relevant.

## V. Duress Is Not a Tort, Except in Cases of Personal Injury. (This section addresses section III of the Defendants' memorandum.)

Defendants', in the second paragraph of section III of their memorandum, errantly aver:

> As a preliminary matter, the Plaintiff's claim should be dismissed under the statute of limitations. His duress claim sounds in tort. *See, e.g., Coxall v. Nichols*, 1992 WL 173321 (Mass. App. 1992) (noting that duress claim constituted a tort.) (emphasis added.)

Though the Court could carefully peruse *Coxall v. Nichols* in a vain search for this nonexistent, broad-brush assertion, it need only refer to M.G.L.A. c. 260 § 2A:

> Under Massachusetts law, determination of whether contract or tort statute of limitations applies is controlled by essential nature of party's claim. Royal-Globe Ins. Co. v. Craven (1992) 585 N.E.2d 315, 411 Mass. 629.

*Royal-Globe Ins. Co. v. Craven* states the following:

> In discussing G.L. c. 260, § 2A, we said that "[t]he 1948 amendment [that enacted the statute] was designed to produce more uniformity in limitation of actions of tort generally and of actions of contract for personal injuries... The purpose of G.L. c. 260, § 2A, was to insure that defendants responsible for personal injuries would not be vulnerable to suit for a longer period of time if sued in contract than if sued in tort.

---

[29] 20 U.S.C. 1077(c)(1)(C), 34 C.F.R. §§ 682.202(b)(2), et al.

14

The Defendants next characterize Plaintiff's claim of duress as having not alleged sufficient facts, and instead consists of a conclusory allegation. The Plaintiff agrees, and would like to file a Motion to Amend Complaint, as is consistent with Mass.R.Civ.P. Rule 15. "[A]mendments are rather liberally allowed ... to enable the plaintiff to sustain the cause of action intended."[30]

The Plaintiff disputes, however, Defendants' contention that he has had "ample opportunity to do so," since neither the Court nor the Defendants have previously described deficiencies which should be cured. Each of the previous four amendments (the first two primarily for minor grammatical improvements) was made without the benefit of the Court's informed input. The Defendants have only effectively seen two amendments, since they received initial notice in one package that contained the summons, complaint, amended complaint, and amended complaint (12/09/03). *All of these items were in the first civil action communication they received, and were essentially the same in content.*

Also, the Plaintiff graciously gave the Defendants an additional 20 days to respond, when the Rules only required 10. In return, they agreed to stipulate that the fourth amended complaint would supersede the others (presumably for some perceived tactical advantage)— while apparently harboring their desire to end run around the well-established propensity of the courts to grant leave to amend in the interest of justice. (The Defendants conceived of and drafted the stipulation, which, in part, read, "The plaintiff does not intend to file any further amendments," and at that time he didn't intend to.)

The Defendants, in the stipulation that they authored, essentially conceded that they effectively only had to respond to a *single* complaint: "Pursuant to Fed. R. Civ. P. 12(a)(1)(A), the Sallie Mae Defendants have twenty (20) days to answer or otherwise respond." Fed.R.Civ.P. 12(a)(1)(A) specifically and exclusively deals with the summons and initial complaint: "[A] defendant shall serve an answer (A) within 20 days after being served with the summons and complaint." And the record shows that they have only filed one response. By voluntarily invoking Fed.R.Civ.P. 12(a)(1)(A), rather than Fed.R.Civ.P. 15(a), the Defendants waived any right to strenuously object[31] to an amendment to cure.

Notably, the Defendants have not filed a Motion for More Definite Statement, nor intimated that one should be filed.

Here are the elements: (i) In the fall of 1995 USA Funds and Nellie Mae threatened legal action and negative credit reporting, while portraying themselves as the government (the Court should not be surprised by this, since SLM, on p. 3 of Defendants' memorandum, attempts to shade itself with the umbrella of Congressional purpose); (ii) These threats quite easily convinced the Plaintiff that he had no choice; and (iii) The Plaintiff received nothing of value in return (he already had the student loans), but by submitting to a new consolidation loan he had to pay a higher interest rate, had the length of time items would appear on his credit enlarged by four or more years, and lost the right to have the Federal Government pay for interest during times of eligible deferment, which cost the Plaintiff no less than $5849.37.

All of Defendants' statements that Mr. Gibbs acted with "free will" are irrelevant. Holding a credit report over someone's head and the threat of prosecution from the government could hardly be considered as permitting an

---

[30] J. R. Nolan, Civil Practice § 239, at 296 (2d ed. 1992).
[31] *A Few Good Men.* ☺

15

exercise of free will. As is found in 25 Am. Jur. 2d §§ 11 and 12 (Plaintiff understands that Am. Jur. 2d is not part of the law; however, the case law and sources that it cites are):

> It has been pointed out, however, that a test using the term "free will" ... is not appropriate because of the vagueness and impracticality of that term. Restatement 2d Contracts § 175 Comment b.
>
> [A] threat may be wrongful although the act threatened is lawful. *Food Fair Stores, Inv. v. Joy*, 283 Md. 205, 389 A2d 874.

Defendants then claim that by making payments Plaintiff ratified the contract. They additionally say that by requesting and receiving two deferments Plaintiff accepted the benefits of the agreement. Plaintiff will address the latter statement first, since this is perhaps the most absurd declaration that the Defendants make in their entire memorandum.

Plaintiff was eligible to continue to receive deferments *on the student loans he had before consolidation,* with one clear exception: he did not have to pay interest during deferment periods on those loans, *but had to pay interest during periods of deferment under the new consolidation loan* that he was forced to sign. **How, in any scenario, having to pay $5849.37 in interest can be characterized as a "benefit" by the Defendants is a mystery.**

As for the former, 25 Am. Jur. 2d § 25:

> [I]t is generally held to be essential to the ratification of a transaction or contract procured by duress that the influence of the duress be removed prior to the alleged ratifying conduct. There can be no ratification while the duress continues. Mullan v. Bishop of Diochese of Orlando (Fla. App. D5) 540 So.2d 174, 14 FLW 691; A. H. Averill Mach. Co. v. Taylor, 70 Mont. 70, 223 P. 918. Motor Equipment Co. v. McLaughlin, 156 Kan. 258, 133 P.2d 149 (holding that as long as duress actually endures, conduct in apparent recognition of instruments executed under duress does not constitute a ratification of such instruments); Fallston Finishing , Inc. v. First Union Nat'l Bank, 76 N.C. App. 347, 333 S.E.2d 621.

Not substantially less opaque is the Defendants' inscrutable equating of "Perhaps most tellingly, he repeatedly expressed his opinions in numerous telephone conversations and letters with the Defendants" with "subsequent acts [that] establish that the complaining party continued to act to his own best judgment." The promissory note makes no mention of the making or exclusion of telephone calls and letters in its language. Consequently, they cannot be construed as an exercise of free will as pertaining to the contract.

## VI. The Defendants Have Engaged in Fraud. (This section addresses section III, 2 of Defendants' memorandum.)

The Defendants also have a point about element four, time, of pleading requirements. The Plaintiff omitted that the date of Sallie Mae's corporate counsel's fraudulent statement was December 18, 2003. But even if the Plaintiff had included the date, he surely could not have relied and acted upon a statement made in December of 2003—but he did rely upon statements made variously by the Defendants, wherein the balance due was misrepresented both in writing and on the telephone, numerous times since the year 2000 (which began in August of 2000, as is averred in ¶¶ 17 and 18 of complaint.)

In regard to Defendants' nonsensical conclusion that "written obliquely intentionally" is tantamount to "conced[ing] that he has not pleaded fraud with the requisite particularity" and that this was "drafted...for some perceived tactical advantage," just what possible advantage could there be? Obliquely is, also, a subjective term. What was said in the letter dated January 8, 2004 is this:

> The specifics of how interest was errantly applied to Plaintiff's account and relevant federal regulations will be filed with the Court.... I am sure you, Sallie Mae, are verse in the applicable law and regulations. The Complaint I filed

16

was written obliquely intentionally.

Clearly, the term obliquely refers to <u>not listing complex mathematical calculations</u>.

Furthermore, the Plaintiff did not describe *fraud allegations* obliquely. To wit: Plaintiff named Robert Stocker, his position, and his statement. The only element not stated was that this occurred on Thursday, December 18, 2003 at 12:59pm. That was left out perchance, because the Plaintiff did not know that fraud allegations should include the date. What possible "perceived tactical advantage" could there be to not including the time?

Mr. Gibbs, when he filed the initial complaint, did not even know Local Rule 16.1(c) of the Federal Court required making an offer of written settlement (Mr. Gibbs filed this action in Barnstable Superior Court); but if he had to let them off the hook so easily, at least he wanted to make them pay for it.

The purpose of writing it obliquely (a subjective term), as was told to Matthew Kane on the telephone, was: "So that 50 lawsuits wouldn't crop up across the country. The Defendants read the complaint and know precisely what I am talking about." Mr. Gibbs discovered the interest overcharges, etc., and wanted to be the plaintiff who made them known.

The present Defendants next mention *W.R. Carney v. Cambridge Technology Partners*, 135 F.Supp.2d 235, 247 (D. Mass. 2001), wherein the plaintiffs were permitted to file an amended complaint four months after the initial complaint, and *after* the defendants had first responded. The crux of the case was the plaintiffs' statement that "the defendants' statements were false or misleading in light of knowledge that the defendants allegedly acquired '*through* the Class Period,'" yet the plaintiffs' focus, and the impetus, of their complaint was upon a Wall Street Journal article that make the stock price rise, precipitating their purchase thereof, and its subsequent plummeting. The Court (with clear common sense) found that knowledge the Defendants acquired, according to the plaintiffs, during the class period (i.e., some time after the statements made in the article) necessarily could not have been known at the time the statements were made.

In the case sub judice, the law requires participant lenders in the student loan program to be fully cognizant of every detail thereof. Indeed, The Defendant SLM Corp. has sued the Department of Education to try to increase the amount of interest and fees it can legally charge.[32] SLM is precisely aware of the interest rates and fees it can charge. SLM has desired to and has charged usurious interest and unauthorized fees in purposeful, willful violation of the law. Additionally, the statement made to Mr. Gibbs by Sallie Mae's corporate counsel confirmed that they were indeed aware that they had been capitalizing interest (i.e., it was not blamed upon some computer or accounting error) and tried to convince the Plaintiff that the law made them do it, while trying to exhort him to settle: "What do we have to do to make this go away?" And *that* is fraud: knowledge, intent, capacity and reliance.

In lieu of an amended complaint[33], discovery pursuant to the *Mail Fraud* violations (alleged in a separate count) of the Defendants will by its nature bare out the allegations of fraud. At such a time, a motion for supplemental pleadings could be filed. Even if the motion is for some reason not affirmatively granted, a new case can be brought against the culpable Defendants.

The FBI is already investigating the Defendants for fraud, of a slightly different flavor (for doctoring unqualified loans to bring them under the auspices of the student loan guarantee program, so that they will be paid

---

[32] United States District Court for the District of Columbia, 00-cv-02660-RWR, Student Loan Finance, et al v. Riley, et al. (Richard W. Riley was the Secretary of Education.)
[33] As is requested in the Plaintiff's Motion to Amend Complaint.

for by the government.) The Plaintiff could enlist the discovery powers of the aforementioned government agency, who may be quite interested in the parallel expansion of their investigation. Whether such investigation could be completed quickly enough to file for supplemental pleadings is unclear. For argument's sake, the Plaintiff is of the opinion that it would not; and is also variably of the opinion that such a tact is too tangential to garner his interest. (The Plaintiff is satisfied that this case is a sufficient response to the malfeasance of the Defendants.)

The Defendants, on p. 16 of their memorandum, continue, "[H]e has not provided any basis for his belief that these statements [by Sallie Mae's corporate counsel] were fraudulent." ¶ 18 of plaintiff's complaint clearly so indicates: "violation of ... Title 34 of the Code of Federal Regulations." The specific regulation is 34 CFR 682.202(b)(2); however, citing the law is not a requirement of notice pleadings.

### VII. The Plaintiff Has a Cause of Action for Breach of Contract. (This section addresses section III, 3 of the Defendants' memorandum.)

Defendants claim on p. 18 that the statute of limitations has run for breach of contract. Their assertion is wholly false. The breach of contract occurred on or after August 18, 2000, but no notice of this breach was given. On October 4, 2002, the Plaintiff noticed inaccurate student loan data on his credit report. He then contacted General Revenue Corporation to ask that it be updated, and to inquire how to pay the balance in full. After receiving written communication over a period of months, in 2003 the Plaintiff noticed that the included balance seemed to be increasing faster than the note and the law allowed. Initially the Plaintiff believed this was due the collection agency adding penalties (unauthorized) every time someone new contacted him, since this is what was told to him by J. S. Smith and other employees of Regional Adjustment Bureau, a collection agency that SLM Corp. or Sallie Mae Servicing, L.P. or General Revenue Corporation hired, which some of General Revenue Corporation's employees confirmed and others denied. Through persistent phone calls and questions, the Plaintiff surmised that the excess charges were likely not due to penalties being added every couple of months. After several fruitless phone calls to get an itemized accounting in writing, Mr. Gibbs, a licensed mortgage broker with a background in finance that included being a licensed Series 7 and 63 securities broker, performed the requisite calculations to identify which facet of the interest assessment was attributable to overcharge.[34] It was discovered, through mathematical calculation, that interest was illegally capitalized[35] by adding interest accrued from 7/13/99 to 8/18/03 to the principal balance of the consolidation loan.

Defendants next falsely state, "Plaintiff has failed to allege which agreement was breached." The Plaintiff's complaint states in ¶¶ 12 and 13: "Over the course of his college education Kipp Gibbs entered into contracts for student loans with the following lenders: Barnett Bank, AFSA, ELSI and ELSC. In 1995, USA Funds and Nellie Mae

---

[34] According to the promissory note (attached as "Exhibit 12B", Item A), simple interest is supposed to be charged, which means that the dollar amount of interest charged per year cannot increase; it is a flat dollar amount. As a simple example, 10% of $1000.00 would after one year be $100.00. The second year the balance would be $1100.00 (one thousand dollars plus one hundred in interest). The key is that the increase for the next year would still be $100.00, and not 10% of $1100.00, or $110.00. Simple interest is charged on the principal only, unlike compound interest, which charges interest upon interest. The Defendants are charging simple interest; however, they are charging it based upon $34,633.10, which includes unauthorized capitalized interest, thereby resulting in a greater annual increase than permitted by either Federal Regulation or by the Plaintiff's promissory note. To fully explain this in layman's terms would take a significant amount of pages; notice pleadings or a response to a Motion to Dismiss are not the place for a detailed explanation of calculations.
[35] 34 CFR 682.202 § (b): "Capitalization. (1) A lender may add accrued interest and unpaid insurance premiums to the borrower's unpaid principal balance in accordance with this section. This increase in the principal balance of a loan is called 'capitalization.'"

18

pressured Mr. Gibbs into signing a consolidation." Plaintiff's complaint continues in ¶ 17: "On August 18, 2000, Plaintiff's consolidation loan entered default status;" in the next sentence states "interest was calculated on an amount not agreed upon;" and specifies in Count IV: "Plaintiff realleges and incorporates herein paragraphs 1 through 36 of his complaint. ¶ 43: "Defendants willfully increased the interest charge on his student loan...by illegally capitalizing interest on his student loan."

Since a *consolidation* loan combines other student loans into one, *and* since SLM Corp. holds the original of said consolidation note (a copy of which is attached as "Exhibit 12A" and "Exhibit 12B"), which specifically lists the loans serviced by the above companies as consolidated into the loan that SLM Corp. currently holds, what other mysterious agreement could they be referring to?

What is more astonishing, is that on the very same page where they say, "the Plaintiff has failed to allege which agreement was breached," in the preceding paragraph, they point out, "Here, the plaintiff alleges that the Defendants overcharged him interest under the 1995 Consolidated Loan." Does the Plaintiff need to cure his complaint, or the Defendants their memory? Or is it that they are simply trying to get the Plaintiff to waste more time and precious space? If more of this continues the Plaintiff may file for abuse of process.

Defendants' characterization in footnote 15 on p. 19 of their memorandum is nonsense. They continue in the main text with: "Perhaps most troubling, the Plaintiff does not allege which of the Defendants entered into the contract at issue." Again, please refer to ¶¶ 12 and 13 of Plaintiff's complaint, where USA Funds and Nellie Mae are so named. Perhaps most troubling are the Defendants' repeated brazen misrepresentations and distortions.

In footnote 16 of the same page, Defendants claim ratification by attempting to ridiculously place the breach of the contract as occurring in 1995 at its inception. Since breach occurred on or after August 18, 2000 and was discovered in 2003, action for breach is not time barred by the six-year statute of limitations. (This breach occurred 18 days after SLM Holding Corp. purchased USA Group, Inc. and took over USA Funds.) Furthermore, the Plaintiff made no payment after breach, as is stated by Defendants.

Per the consolidation loan promissory note, the Defendants are circumscribed by the Higher Education Act, which dictates when interest can be capitalized. (Please see "Exhibit 12B", Items B and C.)

### VIII. Defendants' Specious Motion to Dismiss Should Be Denied. (This section addresses section IV of Defendants' memorandum.)

The Defendants' memorandum is fraught with questionable, thoughtless, contradictory challenges, and with specious selection and misrepresentation of case law. As yet another example of this, on p. 20, they cite "*Demars v. General Dynamics Corp.*, 779 F.2d 97, 99-100 (affirming District Court's denial of leave to amend where amendment would have been futile)." What the Defendants fail to mention is why it was futile: Massachusetts law does not recognize a cause of action for *negligent discharge*, which was the issue in *Demars*.

In the interest of saving space, the Plaintiff trusts the Court has fresh in mind the reasons the Plaintiff believes an amendment should be allowed, as set forth in section V of this memorandum.

## **CONCLUSION**

A complaint should not be dismissed for failure to state a claim (which is the unfounded basis for the Defendants' motion) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Fed.Rules Civ.Proc. rule 12, 28 U.S.C.A., *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99.

For all of the foregoing reasons, and as a matter of law, the Defendants' Motion to Dismiss should be denied.

_____
Kipp R. Gibbs,
Plaintiff, Pro Se
PO Box 42
Osterville, MA 02655
(508) 292-2280