UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Kipp R. Gibbs,
Plaintiff,

v.

SLM Corp. (a.k.a. Sallie Mae and as
USA Education, Inc.), Sallie Mae
Servicing, L.P., Nellie Mae, USA Funds,
General Revenue Corporation,
Defendants.

CIVIL ACTION NO. 03-cv-12565-PBS

## OPPOSITION TO DEFENDANTS' REPLY BRIEF

**I. Defendants' Further Denial of Applicability of Federal Regulations Is Without Legal Merit. (This section addresses section I of Defendants' obfuscated brief.)**

The Plaintiff has notified Sallie Mae's Corporate Counsel of 34 CFR § 682.202 on no less than four occasions. Plaintiff also discussed same with Matthew Kane. However, the Plaintiff does not object to Defendants' filing of a reply brief, since its entry into the record will serve to make any appeal they may have anticipated even more futile.

As is more fully discussed below, the Defendants have illegally capitalized interest on Plaintiff's student loan, and are trying to hide the specific period of illegally capitalized interest among two periods of capitalization that were permitted under the law. That they have proceeded analagously on a green light twice does not mean that their driving through a red light on a third occasion is permitted under a defense that focuses solely upon the two greenlights, yet conspicuously never addresses the red light for which this action was, in part, brought.

**1. Defendants Have Violated the Express and Unambiguous Regulations of Title 34.**

Continuing with the previous analogy, the Defendants go on to state that the law permits driving through a traffic light when the light is green. This is analogous to the Defendants' statement "The Department of Education Regulations Expressly Permit the Defendants to Capitalize Accrued Interest"[1] *when* authorized. The Plaintiff agrees with this statement; however, rather cunningly, the Defendants leave out that the Department of Education <u>does not permit</u> the capitalization of interest under <u>every</u> situation, just as the law does not permit driving through a traffic light under every situation, i.e., when the light is red.

The Defendants on p. 3 of their brief again tangentially recite something that is not in dispute, with the statement "a lender *may capitalize* interest... [f]or a period of authorized <u>deferment</u> [or] ... <u>forbearance</u>." These are two green lights. The Plaintiff addresses the red light (as described in next paragraph), which the Defendants ignore and pretend not to see.

---
[1] See p. 3, section (i) heading of Defendants' brief.

Specifically, the Plaintiff has brought this action primarily, but not exclusively, because the Defendants capitalized interest from 7/14/99 to 8/19/00, <u>which was neither a period of deferment nor of forbearance</u>. Nonetheless, this did not stop the Defendants from ignoring the law by speeding right through the red light by capitalizing interest anyway, albeit the law precisely prescribes <u>when and only when</u> interest may be capitalized (a copy of pp. 657 *and* 653—which the Defendants left out of their attachments—of 34 CFR § 682.202 is enclosed):

> "The charges that lenders may impose on borrowers, either directly or indirectly, are limited to the following:
> ...
> (2) ...a lender may capitalize interest payable by the borrower that has accrued—
>   (i) For the period from the date the first disbursement was made to the beginning date of the in-school period;
>   (ii) For the in-school or grace periods, or for a period needed to realign repayment of an SLS with a Stafford loan, if capitalization is expressly authorized by the promissory note (or with the *written consent of the borrower*);   [This sentence is from p. 653, and is the first sentence of § 682.202.]
>   (iii) For a period of authorized deferment;
>   (iv) For a period of authorized forbearance; or
>   (v) For the period from the date the first installment payment was due until it was made.
> (3) ...Capitalization is again permitted when repayment is required to begin or resume."

Note that nowhere in § 682.202 is capitalization permitted *after* a period of deferment. The last period of deferment ended on 7/13/99 (the Defendants indeed legally capitalized interest on 7/13/99). However, the Defendants *illegally* also capitalized interest on 8/18/00, and this was a violation of the law.

The Defendants' counsel Matthew Kane was sent a spreadsheet (attached as "Exhibit 18A") that clearly indicated the period of illegally capitalized interest (i.e., 7/14/99 to 8/18/00), however, for some reason, they do not address that period in their brief, but pretend it doesn't exist, and instead decide to focus on green lights rather than red.

On p. 3 the Defendants cite *Ordaz v. Illinois Student Assistance Comm'n.*, 287 B.R. 920 (C.D. Ill. 2002). <u>Their cite is completely irrelevant</u>, and appears to be another attempt to fool the Court. The *Ordaz* case describes a newly issued consolidation loan, wherein the *previous* loan's interest was capitalized. (As stated in Plaintiff's complaint, the Defendant's have continuously pressured the Plaintiff to sign a new consolidation loan, which he has refused to do.) Capitalizing interest on a new consolidation loan is a green light, but is not relevant to the present case. The Defendants illegally capitalized interest on an existing loan for a period that is <u>not permitted</u> by § 682.202. And that is that, no matter how many ways the Defendants try to draw the Court off of the scent. By the way, a new consolidation loan requires the consent of the borrower.

On p. 4 the Defendants pull an almost imperceptible shift. They describe capitalization "during <u>periods</u> of deferment and his subsequent default" as Plaintiff's allegations. They then shift the subject in the next sentence to a single "period". <u>Note the guileful change from plural to singular</u>. When they say, "Defendants were entitled to capitalize interest that had accrued during this <u>period</u> without seeking Plaintiff's consent," they are referring to the period of deferment only. They do that to avoid committing perjury, since they are well aware that § 682.202(b)(2)(iii), (iv) exclusively deal with periods of *deferment* and *forbearance*, but <u>not</u> with any time following a period of deferment. The Plaintiff requests that the Court put this question to the Defendants' counsel directly during the hearing and compel an unambiguous answer.

2

The Plaintiff hopes that the Court is offended by this rather brazen attempt to deceive the Court and to insult the Court's intelligence. It is one thing to attempt to dupe the Plaintiff, quite another to attempt to hoodwink the Court.

The Defendants, in footnote 1 on p. 4 of their brief, discuss the promissory note. Their own analysis refutes their position. They quote: "...pay all charges and other costs... *permitted by federal law and regulations*." Since the capitalization of interest *after* a period of deferment is not permitted, their mention of the promissory note only harms their case.

### 2. Plaintiff Has a Private Right of Action.

As is discussed in the Plaintiff's memorandum, there is a clear private right of action (in the interest of saving the Court's reading time, please note that the balance of this section is a reprint of information from Section III of Plaintiff's Memorandum):

Under the common-law, there is a clear distinction in the cases that a private right of action was not implied and those that found an implied private right of action[2]. It was not implied when provisions were construed for the benefit of the government; or when actions were brought to induce a participating institution to make a loan when it had declined one, since there was no specific language stating that the right exists to obtain a loan without consideration of typical credit analysis; but was implied when a loan already existed and language was written specifically for the benefit of the student, as in *De Jesus Chavez v. L.T.V. Aerospace Corp.*, 412 F. Supp. 4 (1976). In *Hudson v. The Academy of Court Reporting*, 746 F. Supp. 718 (1990), the court examined in detail both *Phillips* and *Chavez*:

> ...Phillips v. Pennsylvania Higher Ed. Assistance Agency, 497 F. Supp. 712 (1980) ... In that case the District Court held that "[a] statute such as the Higher Education Act with many beneficiaries must be analyzed in terms of the provisions alleged to be the basis of action." Essentially, by stating that, the Court has found the holding in DeJesus Chavez to be overly broad. The Phillips Court found that the proper application of the first part of the Cort v. Ash test is to determine if the relevant rule or statute itself is one in which the plaintiff is "one of the class for whose especial benefit the statute was enacted." DeJesus Chavez simply found that the entire Higher Education Act provided the plaintiff with an implied right to bring suit, rather than looking at the specific relevant section of the Act. Nonetheless, the Phillips Court [*721] interpreted [**9] the holding in DeJesus Chavez to have analyzed the specific relevant code section and to have concluded that the student has standing since the relevant code section dealt with the applicable interest rate which obviously effects the student that repays the loan. However, nowhere in the DeJesus Chavez opinion was such a specific finding made.
>
> With that in mind, the Phillips Court in analyzing its own case looked at the specific terms of the provision alleged to be the basis of the action... This Court believes the holding in DeJesus Chavez was overly broad and that these types of cases necessitate scrutinizing and [**12] analyzing the specific relevant code section, statute or regulation to determine whether such a private cause of action is implied. This would follow the reasoning in Phillips and virtually every case decided since DeJesus Chavez.

In the present case a loan *has* been made and there exists a lender-borrower relationship. The Plaintiff's complaint states in ¶ 17: "On August 18, 2000, Plaintiff's consolidation loan entered default status;" in the next sentence states "interest was calculated on an amount not agreed upon;" and continues in ¶ 43: "Defendants willfully increased the interest charge on his student loan...by illegally capitalizing interest on his student loan." The Secretary and the

---

[2] *Phillips v. Pennsylvania Higher Ed. Assistance Agency*, 497 F. Supp. 712 (W.D.Pa. 1980): "The Higher Education Act, however, was enacted for the benefit of others in addition to students. [**35] The Chavez case involved a violation of statutory provisions enacted for the benefit of students, specifically interest rate regulations.... The due diligence provision, unlike the interest rate regulations in Chavez, was enacted for the benefit of the federal government."

3

Department of Education have set forth a detailed enumeration of <u>when and only when</u> interest can be capitalized. In 34 CFR §§ 682.202(b)(2) and 682.202(b)(3), beginning with the opening statement of 34 CFR 682.202 (please note item (2)(iii), since this is of particular importance in calculations):

> "The charges that lenders may impose on borrowers, either directly or indirectly, are limited to the following:
> ...
> (2) ...a lender may capitalize interest payable by the borrower that has accrued—
>    (i) For the period from the date the first disbursement was made to the beginning date of the in-school period;
>    (ii) For the in-school or grace periods, or for a period needed to realign repayment of an SLS with a Stafford loan, if capitalization is expressly authorized by the promissory note (or with the *written consent of the borrower*);
>    (iii) For a period of authorized deferment;
>    (iv) For a period of authorized forbearance; or
>    (v) For the period from the date the first installment payment was due until it was made.

Also notice the words "if capitalization is expressly authorized by...written consent of the borrower" in 34 CFR § 682.202(b)(2)(ii). Clearly, the borrower is given authority here; however, this is the Department of Education's interpretation of Congress' Higher Education Act. We must also look to the Higher Education Act itself to determine if an implied private right of action exists.

An implicit private right of action within the Higher Education Act states in 20 U.S.C. § 1077(c)(1)(C): "A consolidation loan made on or after July 1, 1994, shall bear interest at an annual rate on the unpaid principal balance of the loan." *Cort v. Ash*, the touchstone for a private right of action, in regard to the second part of the test for an implicit right of action said:

> It is at least dubious whether Congress intended to vest in the plaintiff class [a private right of action]...the fact that there is no suggestion at all that § 610 may give rise to a suit for damages or, indeed, to any civil cause of action, *Cort v. Ash*, 95 S.Ct. 2080 (1975);

In *Alexander v Sandoval*, 532 U.S. 275, 286 (2001), the Supreme Court reaffirmed that *Cort v. Ash* is still the standard, and has not changed.

Another implied private right of action exists in 20 U.S.C. § 1078-3(d)(4): "The Secretary is *authorized to promulgate such regulations* as may be necessary to facilitate carrying out the provisions of this subsection." (emphasis added.) The Secretary, by power vested in him by Congress, gave an implicit, if not express, private right of action to the borrower with the words "with the written consent of the borrower." 34 CFR § 682.202(b)(2)(ii).

Of particular note is the Defendants' incomplete analysis of their cite of *McCulloch v. PNC Bank*, 298 F.3d 1217, 1226 (11th Cir. 2002). In that case "[a]lthough the Eleventh Circuit has not addressed whether a private right of action exists under HEA," the Court relied upon "the Supreme Court's ruling in *Touche Ross & Co. v. Redington*, which requires some affirmative evidence of congressional intent to create a private right of action." The first thing to note is that the *McCulloch v. PNC Bank* case falls under the classification described in *Hudson*[3] as <u>not</u> a "clearly articulated right":

> ...in applying the Phillips rationale, it is the language contained in 34 CFR § 682.604(d) that is to be scrutinized to determine if a federal right exists. Essentially the regulation dictates when and how the loan proceeds held by the educational institution are to be applied. In reviewing the rule, it is clear that the intent of the Legislature was to

---

[3] *Hudson v. The Academy of Court Reporting*, 746 F. Supp. 718 (1990). (Plaintiff did not make the applicable case law: no offense regarding the name of the case.)

4

protect the government and the lending institution from the misapplication of the loan proceeds toward purposes not intended and unrelated to education. Therefore, this Court, in applying the Phillips line of reasoning and scrutiny, concludes that the regulation was not enacted to benefit the plaintiff, and thus it does not create a federal right in favor of plaintiff. The plaintiff is unable to indicate a clearly articulated federal right.

In the case sub judice, such a right exists in 20 U.S.C. 1077(c)(1)(C) and 34 CFR § 682.202(b)(2), as is listed in detail on the foregoing page by the Plaintiff. The next point of importance in *McCulloch v. PNC Bank*'s reliance upon *Touche Ross & Co. v. Redington*, 99 S.Ct. 2479 (1979), is that in *Redington* the focus by the Supreme Court was § 17(a):

> Every national securities exchange, every member thereof, ... and every broker or dealer registered pursuant to ... this title, shall make, keep, and preserve for such periods, such accounts, correspondence, ... and other records...
> In the District Court's view, § 17(a) was essentially a bookkeeping provision. By its terms, it did not impose any duty on accountants.

The court states that a civil remedy would be permitted if among purchasers and sellers of securities, but was instead an action by a purchaser against an outside accounting firm, not the seller, perpetrator. "§ 17(a) is by its terms limited to purchasers and sellers of securities." 99 S.Ct. 2479 (1979). The Supreme Court in *Touche Ross & Co. v. Redington* characterizes the type language that does allow a private right of action:

> It is true that in the past our cases have held that in certain circumstances a private right of action may be implied in a statute not expressly providing one. But in those cases finding such implied private remedies, the statute in question at least prohibited certain conduct or created federal rights in favor of private parties. E.g., *Cannon v. University of Chicago, supra* (20) U.S.C. § 1681); *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) (42 U.S.C. § 1981); *Superintendent of Insurance v. Bankers Life & Cas. Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (15 U.S.C. § 78j(b)); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (42 U.S.C. § 1982); *Allen v. State Board of Elections*, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969) (42 U.S.C. § 1973c); *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968) (42 U.S.C. § 1982); *J. I. Case Co. v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (15 U.S.C. § 78n(a)). By contrast, § 17(a) neither confers rights on private parties nor proscribes any conduct as unlawful....The intent of § 17(a) is evident from its face. Section 17(a) is like provisions in countless other statutes that simply require certain regulated businesses to keep records.

The United State Supreme Court well described a test for private remedy in *Suter v. Artist M.*, 503 U.S. 347 (1992):

> ...the provision creates an enforceable right unless (2) the provision "reflects merely a `congressional preference' for a certain kind of conduct rather than a binding obligation..." 496 U.S., at 509 (quoting *Pennhurst State School and Hospital* v. *Halderman*, 451 U.S. 1, 19 (1981)), or unless (3) the plaintiff's interest is so " `vague and amorphous' " as to be " `beyond the competence of the judiciary to enforce.' " 496 U.S., at 509 (quoting *Golden State*, 493 U.S., at 106, and *Wright*, 479 U.S., at 431-432).

It is easily discernible that "A consolidation loan made on or after July 1, 1994, shall bear interest at an annual rate on the unpaid <u>principal balance of the loan</u>,"[4] and "the charges that lenders may impose on borrowers, either directly or indirectly, <u>are limited to the following...a lender may capitalize interest payable by the borrower that has accrued...for a period of authorized deferment</u>,"[5] is very clear in creating a binding obligation that is certainly not vague and amorphous, and which can only be excused "<u>if capitalization is expressly authorized by...written consent of the borrower</u>,"[6] (emphasis added) "*or the promissory note the borrower signed.*" Note the promissory note as having authority.

---

[4] 20 U.S.C. § 1077(c)(1)(C).
[5] 34 CFR §§ 682.202 and 682.202(b)(2)(iii)
[6] 34 CFR 682.202(b)(2)(ii).

### II. The Plaintiff Can Maintain A Negligence Claim Against the Defendants.

The Defendants title section II of their reply brief "The Plaintiff May Not Maintain A Negligence Claim Against the Defendants Under the Fair Credit Reporting Act." Yet, in a very case that the Defendants enclosed with their Motion to Dismiss, *George Schwaeble v. Sallie Mae Servicing, L.P. et al.*, is the following:

> The civil liability sections, 15 U.S.C. § 1681n and 1681o, explicitly provide for a private right of action for consumers wishing to enforce any provision of the Fair Credit Reporting Act against "any person" who either "willfully fails to comply" or is "negligent in failing to comply." Absent any explicit limitation, the plain language of 15 U.S.C. §§ 1681n, 1681o, 1681s-2(b) and (c) provide a private right of action for a consumer against furnishers of information who have willfully or negligently failed to perform their duties upon notice of a dispute. Furthermore, the negative inference of explicitly precluding a consumer's right of action for violations of § 1681s-2(a) is that they are preserved in § 1681s-2(b). Accordingly the plain language of the Fair Credit Reporting Act compels the conclusion that there is a private right of action for consumers to enforce the investigation and reporting duties imposed on furnishers of information.

The Defendants, astonishingly, argue against their own case law, which they not only cite, but also include with their so-called motion to dismiss. (*And they call the Plaintiff vexatious?*)

*Schwaeble* also helps to weed out the machinations of the Defendants on pp. 5-7 of their reply brief, wherein the Defendants try to lead the Court down a wayward, and irrelevant path. Fully one half of their blustery argument can be whittled down to footnote 6 of their brief: "holding that there is no private right of action for violation of Section 1681s-2(a)" Note above (excerpt from *George Schwaeble v. Sallie Mae Servicing, L.P. et al.*): "Furthermore, the negative inference of explicitly precluding a consumer's right of action for violations of § 1681s-2(a) is that they are preserved in § 1681s-2(b)."

The Defendants attempt to focus the Court's attention on two irrelevant sections of the FCRA to take the Court's attention away from the balance of the FCRA. Also, as usual, Defendants cite case law that discusses narrowly defined, unrelated issues. (Note that the Plaintiff cites negligence and willful misreporting in his complaint.)

As a further illustration of Defendants' attempts to entangle the Court in irrelevant mumbo-jumbo, the Defendants launch into a plethora of circular arguments—with equally irrelevant case law—(the other half of pp. 5-7) to dwell on § 1681s-2(b), which is titled: "Duties of furnishers of information upon notice of dispute." As the Court can easily determine, this has no bearing on the remainder of the FCRA, as is succinctly described by the *Schwaeble Court*, above.

Next the Defendants address the penalty amount of 18.5%. They misread the year 2000 letter to the Plaintiff from Education Debt Services, Inc. ("EDSI"). The letter clearly indicates that 18.5% *was* applied to his current consolidation loan when they charged him $6580.29, which is 18.5% of $35,545.37. The letter *also* mentions the limitation of 18.5% if Mr. Gibbs consolidated his loan a second time. The plaintiff mentioned this fact in his memorandum to support the practice of an 18.5% limit. It is unequivocally clear that the letter states that the collection costs on Mr. Gibbs present consolidation loan are $6580.29.

At no time after the Defendants got their hands on USA Funds and started raising the prices of everything did the Defendants inform the Plaintiff of their surreptitious augmentation of the penalty amount from $6580.29 to $7964.85, until the Plaintiff pressed them for an itemization of unexplained overcharges.

Also, USA Funds is a nonprofit organization, yet Sallie Mae started raising prices and overcharging student loan borrowers. Since USA Funds is nonprofit, how did Sallie Mae expect to reap the benefits of usurious interest charge? Quite easily: they purchased the loan and kept the difference that they skimmed off the top.

The Defendants next allege on p. 6 of their brief that the "Plaintiff does not (and cannot) contend that the Defendants are 'consumer reporting agencies.'" So what is their argument? Perhaps the Defendants could volunteer to limit their windy discussion to elements actually alleged (a reasonable expectation). Perhaps they wanted the Plaintiff and the Court to take the bait, as they attempt to distract from the cogent issues (again). Accordingly, the balance of p. 6 is irrelevant.

However, the Plaintiff will repudiate their inaccurate claim on p. 6 that there is no private right of action, but will not again take up the Court's time with a transcription of Plaintiff's previous at length refutation of this assertion (as is addressed in Section III of Plaintiff's memorandum at 4).

On p. 7 Defendants go on about not having received notification from a consumer reporting agency. *That is a lie*, plainly and simply, and also fails since it does not pertain to willful misreporting. The Plaintiff notified the credit bureaus in writing, who in turn wrote to the Defendants as required by law.[7] The Defendants continue to misreport inaccurate data to the credit bureaus.

The Defendants aver in footnote 10 on p. 7 of their brief "[r]ecognizing the problems with his FCRA claim, Plaintiff suggests..." This averment is absolutely false. The Defendants do not know the state of mind of the Plaintiff. The Plaintiff cited § 54A(a) to bring the current suit under § 54A(a), not a future suit, *in addition to* the FCRA. It is simply wishful and insincere thinking by the Defendants that the Plaintiff would do otherwise.

According to *J. R. Nolan, Civil Practice* § 237, at 292 (2d ed. 1992):

> Where the cause of action is founded upon a statute, while it is preferable in plaintiff's initial pleading to cite the statute relied upon, a failure to do so is not fatal, there being no statutory requirement for such citation, and it being enough if the plaintiff sets forth the facts which bring him within the statute relied on. City of Springfield v. Com., 39 Mass. 267, 270, 207 N.E.2d 891, 893 (1965).

15 U.S.C. § 1681t: "Relation to State Laws...this subchapter does not annul, alter, affect, or exempt any person subject to the provisions of this subchapter from complying with the laws of any State." The Defendants' mention of *Quigley*, 2000 WL 1721069 is differentiated from the current case and irrelevant.

### III. Plaintiff's Claims for Duress and Mail Fraud Are Allowed As a Matter of Law. (This section addresses section III of Defendants' denial.)

Since Plaintiff never ratified the contract—and it was and continues to be forced upon him against his will—as is a well-established legal principle, there can be no applicable statute of limitations. Notably, the Defendants artfully simply say there is a statute of limitations, but cite no law or common-law authority, which is tantamount to admitting that they know none exists.

Subsequently, the Defendants claim to be given a pass for Federal Mail Fraud, even though the Supreme Court has explicitly granted a private right of action, as is more fully set forth in on p. 9 of Plaintiff's Memorandum.

---

[7] 15 U.S.C. § 1681i.

The Plaintiff is confident the Court can distinguish between 18 U.S.C. § 1341 and 18 U.S.C. § 1961(1). The Defendants cite *Swartz v. Schering-Plough Corp.*: "While federal law criminalizes mail fraud, *see* 18 U.S.C. § 1341, it does not give rise to a private right of action." The Plaintiff necessarily infers that the *Swartz Court* circumscribed its analysis to § 1341, since 18 U.S.C. § 1961(1) clearly provides a private right of action for mail fraud. Otherwise, it could only be concluded that the *Swartz Court* did not keep abreast of U.S. Supreme Court decisions, which expressly permit a private right of action for mail fraud. Defendants' statement in footnote 11 that "Ryan remains good law" is only good if impugning the United States Supreme Court is "good." The Plaintiff, in his pro se[8] opinion, believes that U. S. Supreme Court decisions bind all lower courts.

## IV. Plaintiff, In the Interest of Justice, Should Be Allowed to Amend His Complaint, If the Court Deems That Such Amendment Is Required to Sustain Facets of the Plaintiff's Complaint.

In the Scheduling Conference on January 29, 2004 the Defendants mischaracterized the transactions between the Plaintiff and the Defendants' counsel when they asked that no further amendments be allowed. The Plaintiff was not provided with the opportunity to respond to this disingenuous assessment by Defendants' counsel. The Plaintiff also takes exception with Defendants' counsel's aspersion that the Plaintiff has a "take-it-for-granted" attitude and that the Plaintiff is "vexatious." The Defendants' wording would seem to indicate that if there is some degree of vexation, it exists in Matthew Kane's own thoughts, as is evidenced by his slights.[9] The Plaintiff is indifferent to this petty exchange. The Plaintiff is, however, not disinterested in the attempt of Defendants' counsel to circumvent well-established principles of law by trying to shift the focus to baseless characterizations, and away from the gravity of the matter at hand. Accordingly, as is permitted under the law, the Plaintiff iterates his request for leave to amend, should the Court believe that such amendment is desirable and equitable to sustain some facets of Plaintiff's complaint.

The Court need not mire itself further in the questionable text of p. 9 of Defendants' brief, since it has been shown ad infinitum in Plaintiff's Memorandum that Defendants' Motion to Dismiss should be denied.

The Defendants' counsel makes another assertion that "Plaintiff threatens (literally) to subject Defendants to never-ending litigation [since Plaintiff is] 'quite willing' to file another complaint in Barnstable Superior Court." Though Defendants' inflammatory charges really do not belong in their brief, since they are not relevant to the current proceedings, the Plaintiff, nonetheless, will dignify their emotionalistic exaggeration with a response:

♦ Firstly, filing one suit is not equivalent to *never-ending* (though stating the obvious should be unnecessary).

---

[8] The Defendants' counsel take for granted that *pro se* effectively means *without say*, and is perhaps the reason for their over-confident, yet surprisingly error-filled motion to dismiss.

[9] Understandably, Defendants' counsel may feel vexed and overwhelmed. Plaintiff would imagine it is upsetting for a mammoth, insular-thinking corporation and its cadre of attorneys to be confounded by a pro se plaintiff, particularly when they feel that no one has a right to question or oppose them. Indeed, in footnote 11 of their brief, counsel classify Plaintiff's illumination of a private right of action as "quarrel[ing]". Is there a clearer indication of the Defendants' frustration resulting from their dictatorial perspective? Perhaps next the Defendants will tell the Court to mind its own business, like everyone else. (Yes, the Plaintiff is aware that vexatious has another meaning, as well.)

- Second, the Defendants' employees egregiously gave out Plaintiff's social security number over the telephone to random companies that they found by "searching the Internet," in a clear and nearly incredible violation of Privacy laws and the FDCPA. Since this information was discovered within the past 14 days[10], it cannot be added to the current lawsuit. However, in no way, shape or form does the Plaintiff intend to let the Defendants get away with their cavalier running afoul of consumer law and Plaintiff's rights. The Defendants then say that they find such an attitude vexatious. Defendants indubitably would prefer to be given a pass on all illegal activities.

The Defendants' then complain about Plaintiff's suggestion that he will simply file a "new case." The Plaintiff will be clear: Plaintiff will file every case that violations of the law merit. The Defendants' characterization that this would be "endless" is essentially an admission that discovery will produce and endless number of illegalities.

Next, the Defendants theatrically state the "Plaintiff menacingly promised that 'there are other legal avenues that are scheduled to be implemented.'" The Plaintiff finds it interesting that "legal avenues" are menacing to the Defendants. Perhaps for good reason.

The Defendants next go on about some supposed independent vow to "open the floodgates of lawsuits…" They left out what would cause that flood of lawsuits: disseminating the information of their illegal activities. Would any reasonable and knowledgeable person believe that once it becomes generally known that the Defendants have illegally charged student loan borrowers usurious interest in the *billions* of dollars that there won't be a tidal wave of lawsuits filed by lawyers across the country? The Defendants have buried their heads in the sand long enough. Would the Plaintiff publish this information in the event that this lawsuit does not bring this information out? Quite simply: yes.

## V. Defendants Assertions on Page 10 of Their Brief Do Not Sound in Law, But Instead Are Emotional Appeals.

As for the damages the Plaintiff suffered, the Plaintiff did not concede that he had suffered damages under $2000.00.[11] What the Plaintiff responded to when asked was what damage amount the overcharges summed to. The Defendants have parsed the complaint and ignored the other counts. Plaintiff's damages are over $100,000.00, as was provided to the Defendants' counsel in disclosure.

Nonetheless, to bring the Defendants' argument to its logical conclusion: implicit in Defendants' statement is that because the interest and penalty overcharges on a single individual are approximately $2000.00 (leaving aside damages of other counts), that they should be allowed to get away scott free, even though $2620.02 x 650,000 persons is almost two *billion* dollars. (Note that the estimated class size of 650,000 is a low estimate, as is described in footnote 18 or memorandum.) But perhaps the law does not apply if damages are $2000.00, inasmuch as the

---

[10] Defendants furnished over 100 pages of fine-print log files to Plaintiff, in which their employees recorded their violations of privacy law, which further support Plaintiff's contention that their employees were not properly trained or supervised. Since this information was released, it is likely the Defendants' counsel did not take the time to read the voluminous documents, which incriminate their clients.
[11] Plaintiff believes that he characterized the number of penalty and interest overcharge as approximately $2500.00. Plaintiff's total damages are, in fact, over $100,000.00.

9

**Count IV Calculations (Please see attached page for explanation of calculations.)**

| Dates | Principal Balance | Int. rate | Int./yr. | Int./day | # Days | Int./period | Defendants Charged | Difference | Reason |
|---|---|---|---|---|---|---|---|---|---|
| 11/1/96 4/21/97 | 27,522.46 | 0.09 | 2,477.02 | 6.78636 | 171 | 1160.47 | 1315.52 | 155.05 | Unexplained by Defendant(s) |
| | Balance pay down, as noted on Exhibit 10 enclosed with Memorandum of Law: $8.65 (27,531.11 - 27,522.46). To obtain balance amount listed in Period II add Int./period to balance of Period I and subtract 8.65. | | | | | | | | |
| 7/28/98 7/13/99 | 28,682.93 | 0.09 | 2,581.46 | 7.07250 | 350 | 2475.38 | 2696.56 | 221.18 | Unexplained by Defendant(s) |
| 7/14/99 8/18/00 | 31,158.30 | 0.09 | 2,804.25 | 7.68287 | 401 | 3080.83 | 3118.89 | 38.06 | Unexplained by Defendant(s) |
| 8/18/00 2/1/04  A | 31,158.31 | 0.09 | 2,804.25 | 7.68287 | 1261 | 9,688.10 | 10,768.51 | | Defendant(s) illegally capitalized interest |
| | | | | | | | Individual  A | | |
| 8/18/00 2/1/04  B | 31,514.21 | 0.09 | 2,836.28 | 7.77063 | 1261 | 9,798.76 | 10,768.51 | | Using balance listed by Defendant(s) on Exhibit 10 |

Estimated class size (as described in footnote 18 of Memorandum of Law) is 650,000 persons, but may be as high as 4 million persons; however, the figures for the estimation of 4 million persons are not included: it is extraneous, since discovery will determine the correct class size.

This line is the product of 1235.46 x 650,000.     A     Class     $803,050,404.53
This line is the product of 969.75 x 650,000.       B     Class     $630,336,978.40

Also note that the Defendants Sallie Mae Servicing, L.P. (merged out of existence into Sallie Mae, Inc. after this lawsuit was filed) and USA Funds have their calculations in their Eagle database tracking system, which they describe as state-of-the-art.


EXHIBIT 18A

## **Explanation of Count IV Calculations**

Period I
- Dates: 11/1/96 through 4/21/97 is a deferment period.
- Principal Balance: Balance of 27,522.46 is from Exhibit 10.
- Int. rate: The interest rate is on Exhibit 9, and is the correct rate per the promissory note.
- Int./yr.: Is the product of the *Principal Balance* and *Int./rate*.
- Int./day: Is the *Int./yr.* divided by 365 (days per year, not adjusting for leap year of 1996).
- # Days: Is the number of days in the period.
- Int./period: Is the product of *Int./day* and *# Days*.
- Defendants Charged: Amount of interest charged by Defendant(s) over same period (which can be calculated by referring to Exhibit 10 and subtracting the *Principal Balance* of 10/26/96 from the *Principal Balance* of 4/21/97).
- Difference: Subtract *Int./period* from *Defendants Charged* to obtain figure.
- Reason: Self-explanatory.

Period II
- Dates: 7/28/99 through 7/13/99 is a deferment period.
- Principal Balance: Is the sum of the *Period I* columns *Principal Balance* and *Int./period* less the difference between rows 10/26/96 and 02/06/96 of Exhibit 10.

The remaining columns of *Period II* are calculated in the same manner as described above for *Period I* (likewise for *Periods III* and *IV*).

Period III
- Dates: 7/14/99 through 8/18/00 is the time following the previous deferment to the day of Default.
- Principal Balance: Is the previous *Principal Balance* combined with the *Int./period* of *Period II*.

Period IV (A)
- Dates: Date of default to beginning of this month.
- Principal Balance: As above.

Period IV (B)
- Principal Balance: Utilizes the balance listed by the Defendants on Exhibit 10.



**Off. of Postsecondary Educ., Education** § 682.202

receipt of a Consolidation loan except that—

(1) Eligible loans received prior to the date a Consolidation loan was made and loans received during the 180-day period following the date a Consolidation loan was made, may be added to the Consolidation loan based on the borrower's request received by the lender during the 180-day period after the date the Consolidation loan was made;

(2) A borrower who receives an eligible loan after the date a Consolidation loan is made may receive a subsequent Consolidation loan; and

(3) A Consolidation loan borrower may consolidate an existing Consolidation loan only if the borrower has at least one other eligible loan made before or after the existing Consolidation loan that will be consolidated.

(e) In the case of a married couple, the loans of a spouse that are to be included in a Consolidation loan are considered eligible loans for the other spouse.

(Authority: 20 U.S.C. 1077, 1078, 1078–1, 1078–2, 1078–3, 1082, and 1091)

[57 FR 60323, Dec. 18, 1992, as amended at 59 FR 25745, May 17, 1994; 59 FR 33349, June 28, 1994; 59 FR 61215, Nov. 29, 1994; 60 FR 61756, 61815, Dec. 1, 1995; 60 FR 65021, Dec. 18, 1995; 62 FR 63433, Nov. 28, 1997; 64 FR 18975, Apr. 16, 1999; 64 FR 58952, Nov. 1, 1999; 65 FR 65619, 65691, Nov. 1, 2000; 66 FR 44007, Aug. 21, 2001]

### § 682.202 Permissible charges by lenders to borrowers.

The charges that lenders may impose on borrowers, either directly or indirectly, are limited to the following:

(a) *Interest.* The applicable interest rates for FFEL Program loans are given in paragraphs (a)(1) through (a)(4) of this section.

(1) *Stafford Loan Program.* (i) For loans made prior to July 1, 1994, if the borrower, on the date the promissory note evidencing the loan is signed, has an outstanding balance of principal or interest on a previous Stafford loan, the interest rate is the applicable interest rate on that previous Stafford loan.

(ii) If the borrower, on the date the promissory note evidencing the loan is signed, has no outstanding balance on any FFEL Program loan, and the first disbursement is made—

(A) Prior to October 1, 1992, for a loan covering a period of instruction beginning on or after July 1, 1988, the interest rate is 8 percent until 48 months elapse after the repayment period begins, and 10 percent thereafter; or

(B) On or after October 1, 1992, and prior to July 1, 1994, the interest rate is a variable rate, applicable to each July 1–June 30 period, that equals the lesser of—

(*1*) The bond equivalent rate of the 91-day Treasury bills auctioned at the final auction prior to the June 1 immediately preceding the July 1–June 30 period, plus 3.10 percent; or

(*2*) 9 percent.

(iii) For a Stafford loan for which the first disbursement is made before October 1, 1992—

(A) If the borrower, on the date the promissory note is signed, has no outstanding balance on a Stafford loan but has an outstanding balance of principal or interest on a PLUS or SLS loan made for a period of enrollment beginning before July 1, 1988, or on a Consolidation loan that repaid a loan made for a period of enrollment beginning before July 1, 1988, the interest rate is 8 percent; or

(B) If the borrower, on the date the promissory note evidencing the loan is signed, has an outstanding balance of principal or interest on a PLUS or SLS loan made for a period of enrollment beginning on or after July 1, 1988, or on a Consolidation loan that repaid a loan made for a period of enrollment beginning on or after July 1, 1988, the interest rate is 8 percent until 48 months elapse after the repayment period begins, and 10 percent thereafter.

(iv) For a Stafford loan for which the first disbursement is made on or after October 1, 1992, but before December 20, 1993, if the borrower, on the date the promissory note evidencing the loan is signed, has no outstanding balance on a Stafford loan but has an outstanding balance of principal or interest on a PLUS, SLS, or Consolidation loan, the interest rate is 8 percent.

(v) For a Stafford loan for which the first disbursement is made on or after December 20, 1993 and prior to July 1, 1994, if the borrower, on the date the

653

**Off. of Postsecondary Educ., Education** § 682.202

July 1 and ending on June 30 preceding each 12-month period is equal to the sum of—

(A) The bond equivalent rate of the 91-day Treasury bills auctioned at the final auction prior to June 1; and

(B) 3.25 percent in the case of a loan described in paragraph (a)(6)(i) of this section or 3.10 percent in the case of a loan described in paragraph (a)(6)(ii) of this section.

(iii)(A) In connection with the conversion specified in paragraph (a)(6)(ii) of this section for any period prior to the conversion for which a rebate has not been provided under paragraph (a)(6) of this section, a lender or holder shall convert the interest rate to a variable rate.

(B) The interest rate for each period shall be reset quarterly and the applicable interest rate for the quarter or portion shall equal the sum of—

(1) The average of the bond equivalent rates of 91-day Treasury bills auctioned for the preceding 3-month period; and

(2) 3.25 percent in the case of loans as specified under paragraph (a)(6)(i) of this section or 3.10 percent in the case of loans as specified under paragraph (a)(6)(ii) of this section.

(iv)(A) The holder of a loan being converted under paragraph (a)(7)(iii)(A) of this section shall complete such conversion on or before January 1, 1995.

(B) The holder shall, not later than 30 days prior to the conversion, provide the borrower with—

(1) A notice informing the borrower that the loan is being converted to a variable interest rate;

(2) A description of the rate to the borrower;

(3) The current interest rate; and

(4) An explanation that the variable rate will provide a substantially equivalent benefit as the adjustment otherwise provided under paragraph (a)(6) of this section.

(v) The notice may be provided as part of the disclosure requirement as specified under § 682.205.

(vi) The interest rate as calculated under this paragraph may not exceed the maximum interest rate applicable to the loan prior to the conversion.

(b) *Capitalization.* (1) A lender may add accrued interest and unpaid insurance premiums to the borrower's unpaid principal balance in accordance with this section. This increase in the principal balance of a loan is called "capitalization."

(2) Except as provided in paragraph (b)(4) of this section, a lender may capitalize interest payable by the borrower that has accrued—

(i) For the period from the date the first disbursement was made to the beginning date of the in-school period;

(ii) For the in-school or grace periods, or for a period needed to align repayment of an SLS with a Stafford loan, if capitalization is expressly authorized by the promissory note (or with the written consent of the borrower);

(iii) For a period of authorized deferment;

(iv) For a period of authorized forbearance; or

(v) For the period from the date the first installment payment was due until it was made.

(3) A lender may capitalize accrued interest under paragraphs (b)(2)(ii) through (iv) of this section no more frequently than quarterly. Capitalization is again permitted when repayment is required to begin or resume. A lender may capitalize accrued interest under paragraph (b)(2) (i) and (v) of this section only on the date repayment of principal is scheduled to begin.

(4)(i) For unsubsidized Stafford loans disbursed on or after October 7, 1998 and prior to July 1, 2000, the lender may capitalize the unpaid interest that accrues on the loan according to the requirements of section 428H(e)(2) of the Act.

(ii) For Stafford loans first disbursed on or after July 1, 2000, the lender may capitalize the unpaid interest—

(A) When the loan enters repayment;

(B) At the expiration of a period of authorized deferment;

(C) At the expiration of a period of authorized forbearance; and

(D) When the borrower defaults.

(5) For any borrower in an in-school or grace period or the period needed to align repayment, deferment, or forbearance status, during which the Secretary does not pay interest benefits and for which the borrower has agreed to make payments of interest, the

657